# Illinois Official Reports

## Appellate Court

---

### *Fogt v. 1-800-Pack-Rat, LLC*, 2017 IL App (1st) 150383

---

| | |
|---|---|
| Appellate Court Caption | ISAAC FOGT and LISA FOGT, Plaintiffs-Appellants, v. 1-800-PACK-RAT, LLC, a Delaware Limited Liability Company, WM PACK-RAT OF ILLINOIS, LLC, a Delaware Limited Liability Company, WM PACK-RAT, LLC, a Delaware Limited Liability Company, WM STORAGE, INC., a Delaware Corporation, and WASTE MANAGEMENT, INC., a Delaware Corporation, Defendants-Appellees (WM Storage II, Inc., a Delaware Corporation, Defendant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-0383 |
| Filed | March 10, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-4105; the Hon. Mary Lane Mikva, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James W. Fessler, Donald E. Renner III, and Jacob H. Karac, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellants.<br><br>Matthew J. Gehringer and Bates McIntyre Larson, of Perkins Coie LLP, of Chicago, for appellees. |

| Panel | JUSTICE HALL delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiffs, Isaac (Isaac) and Lisa (Lisa) Fogt, appeal from an order of the circuit court of Cook County granting summary judgments to the defendants—1-800-Pack-Rat, LLC, WM Pack-Rat of Illinois, LLC, WM Pack-Rat, LLC, Waste Management, Inc., and WM Storage, Inc. (collectively, the defendants)—and denying the plaintiffs' motions for summary judgment. On appeal, the plaintiffs contend that they established as a matter of law that (1) the defendants violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 (West 2008)); (2) Waste Management, Inc. was liable for the acts of WM Pack-Rat of Illinois, LLC; (3) the plaintiffs were entitled to an award of punitive damages on their conversion claim or, in the alternative, it was an issue for the trier of fact; and (4) WM Pack-Rat, LLC was liable for the acts of WM Pack-Rat of Illinois, LLC.

¶ 2                                    BACKGROUND

¶ 3    The facts set forth herein are taken from the pleadings, the depositions, exhibits, and other pertinent documents contained in the record on appeal.

¶ 4                            I. The Corporate Defendants

¶ 5    The defendants are five business entities. The plaintiffs raise issues as to the liability of certain corporate defendants for the actions of other corporate defendants. Therefore, it is necessary to identify each one and set forth their relationships during the relevant time period.

¶ 6                            A. 1-800-Pack-Rat, LLC

¶ 7    1-800-Pack-Rat, LLC (Pack-Rat), is a Delaware limited liability company, based in North Carolina. Pack-Rat operates a self-storage facility and moving company. Pack-Rat facilities were owned and operated by Pack-Rat directly or by third-party developers or third-party franchisees.

¶ 8                            B. WM Storage Facility

¶ 9    On June 1, 2007, WM Storage Facility, Inc. (WMS), was incorporated in Delaware. WMS is based in Houston, Texas, and has its own officers and employees and a single director. All WMS stock was owned by Waste Management Holdings, Inc., which is not a defendant in this case.

¶ 10                           C. WM Pack-Rat, LLC

¶ 11   WM Pack-Rat, LLC (WM Pack-Rat), was formed by WMS and Pack-Rat pursuant to the June 1, 2007, Definitive Agreement and the Limited Liability Operating Agreement of WM Pack-Rat (Operating Agreement). WMS and Pack-Rat owned all the ownership units of WM

Pack-Rat.

### D. WM Pack-Rat of Illinois, LLC

¶ 13     WM Pack-Rat of Illinois, LLC (WM IL), was formed by WM Pack-Rat to operate its Illinois facilities. WM Pack-Rat owned all of the ownership units of WM IL. WM IL had a single management member, and between 2007 and 2009, it had its own employees. Pursuant to the June 1, 2009, Asset Contribution Agreement, WM Pack-Rat contributed to WM IL the assets of its facilities in Glendale Heights and Gurnee, Illinois, and WM IL assumed the liabilities related to those facilities and assets. By the December 31, 2009, Asset Contribution Agreement, WM Pack-Rat and its subsidiaries, including WM IL, transferred these facilities, liabilities, and assets back to Pack-Rat and ceased to operate any Pack-Rat facilities in Illinois.

### E. Waste Management, Inc.

¶ 15     Waste Management, Inc. (WMI), is a Delaware corporation. WMI owns 100% of Waste Management Holdings, Inc., which in turn owns 100% of WMS.

### II. Joint Venture

¶ 17     In his deposition, Andrew Friedman, vice president and general counsel for Pack-Rat, testified that Pack-Rat was looking to expand its presence in other markets and was signing contracts with large area developers. Attorney Friedman explained that he was not involved in the initial execution of the WM Pack-Rat, LLC operations agreement, and he could not speak for WMI as to their intentions in negotiating with Pack-Rat. But he reasoned that, like any successful company, WMI wished to make use of its property.

¶ 18     On June 1, 2007, WMS was incorporated in Delaware, and WM Pack-Rat was formed as a limited liability company. On that same date, WMS and Pack-Rat entered into the Definitive Agreement. According to the Definitive Agreement, WMI was a party to the Definitive Agreement, "solely for purposes of Section 6.2." Section 6.2 provided in pertinent part as follows:

> "WMI Guaranty. Subject to Section 11.11 of the Developer Operating Agreement and as a material inducement to Pack Rat Parent entering into this Agreement with WMS, WMI *** does hereby guarantee the due and timely performance or discharge of all of WMS's obligations (including non-competition and financing provisions in Sections 3.1 and 5.1 respectively) under this Agreement."

¶ 19     Under the terms of the Definitive Agreement, WMI, WMS, or an affiliate agreed to provide financing or arrange financing for the purchase of equipment for the Pack-Rat locations. The Definitive Agreement provided that (1) WMS, WMI and affiliates had the right to participate in Pack-Rat's exercise of its buy-back option of any entity operating as a Pack-Rat franchisee, licensee, or joint venture; (2) where WMS or its affiliates were interested in developing territories already under contract by other developers, Pack-Rat would use its best efforts to facilitate the transfer of the right to develop those territories to WMS or its affiliate; (3) WMS and its affiliates would be permitted to develop new products to be offered at select Pack-Rat locations; (4) WMS was permitted to appoint a representative to serve as an observer at all Pack-Rat board of directors' meetings; (5) WMS and its affiliates were given the right of first offer in the event Pack-Rat's board of directors decided to sell Pack-Rat's assets or other equity

interests; and (6) upon the opening of 20 Pack-Rat locations, the Pack-Rat board of directors was required to name to the board one voting member designated by WMS.

¶ 20 On June 8, 2007, WMS and Pack-Rat entered into the Operating Agreement setting forth their rights, duties, powers, and obligations as members of WM Pack-Rat. According to the June 1, 2009, contribution amendment to the Operating Agreement and the Definitive Agreement, WMS, WM Pack-Rat, and Pack-Rat entered into the Operating Agreement and the Definitive Agreement "to facilitate the opening of multiple [Pack-Rat] Locations and otherwise develop a business relationship with respect to the ongoing development and expansion of the business of [Pack-Rat]." The amendments to the Operating and Definitive Agreements were "to reflect the intent of the parties and to enable them to achieve their respective business objectives."

¶ 21                                             III. Lien Claim and Sale Procedures

¶ 22 In his deposition, Nathan Olson testified that he was originally hired by Pack-Rat and trained as a truck driver. In August of 2006, he was promoted to manager of Pack-Rat's Glendale Heights facility. Mr. Olson's managerial training was both on the job and through instruction by individuals from the corporate office, either in Illinois or North Carolina. In April 2009, the Glendale Heights facility was closed, and storage units were relocated to Bolingbrook or Gurnee, Illinois. On June 1, 2009, Mr. Olson became an employee of WM IL and the manager of both locations.

¶ 23 With respect to the lien and sale procedures at the Glendale Heights facility, Mr. Olson utilized the Step-by-Step Procedure. He had been orally instructed on this procedure by Kevin Barbour, his manager who was based in North Carolina. After a customer's rental payments became 90 days past due, a notice of lien and sale date would be sent to the customer by certified mail. Between the mailing date and the date of the sale, attempts to reach the customer would continue, and notices would be placed in the local newspaper. Mr. Olson would contact Mr. Barbour and review the customer's file and the notice and sale documentation with him before proceeding with the sale. This review was not "official."

¶ 24 Mr. Olson explained that the notice of lien and sale was a form created by the SiteLink Reminder software (SiteLink), which he used when employed by Pack-Rat. While the form would already contain most of the necessary customer information, Mr. Olson would insert information such as the sale date, the facility name, and the dollar amounts.

¶ 25 In his deposition, Kevin Barbour testified that from 2006 to 2010, he was in operations support for Pack-Rat, part of which involved training individuals on various parts of SiteLink. The Step-by-Step Procedure for selling a delinquent customer's property was created by a staff attorney for Pack-Rat and was programmed into SiteLink. While the procedures for each state would be the same, the timeline for each state would be different. According to Mr. Barbour, at the time Pack-Rat was responsible for the facilities, each state's timeline was programmed into SiteLink. Mr. Barbour did not recall reviewing delinquent customers' files with a facility manager prior to a sale of their property.

¶ 26 In his deposition, Andrew Friedman, vice president of and general counsel for Pack-Rat, testified that he did not consider ensuring that information programmed into SiteLink complied with the laws of the various states in which Pack-Rat operated. He had never been contacted by Pack-Rat's operations department to review the program to determine if it was in

compliance with the local laws.

¶ 27                                    IV. Rental of the Storage Unit

¶ 28        In preparation for placing their house on the market to sell, Lisa entered into a rental agreement with Pack-Rat to store certain of the plaintiffs' belongings. On February 27, 2009, Pack-Rat delivered a storage container to the plaintiffs' residence at 930 South Euclid Avenue in Oak Park, Illinois (Euclid Avenue residence).

¶ 29        Upon delivery of the storage container, Lisa initialed or signed several documents, including the Rental Agreement, the Delivery Agreement, and the Insurance Addendum. Lisa agreed to have the monthly rental payments automatically deducted from her MasterCard. She declined Pack-Rat's offer to provide insurance coverage pursuant to the Insurance Addendum. Under the terms of the rental agreement, Lisa agreed to "insure the actual full value of the stored property against loss or damage. *** To the extent you do not obtain insurance or contract with us to assume responsibility *** you waive all claims against us for loss and damage to the contents placed in the Container."

¶ 30        The rental agreement provided that the failure to pay any installment of the rent or other amounts due under the Rental Agreement within ten (10) days of the due date constituted an "event of default." The Rental Agreement further provided that the customer granted Pack-Rat a contractual lessor's lien on the stored property to secure payment of the rent or other charges and fees payable under the agreement. In the event of a default by the customer, the Rental Agreement provided in pertinent part as follows:

> "[W]e may begin the enforcement of our lien including the denial of access to the Container by you, against all property of yours stored in the Container or at the Warehouse in accordance with the laws of the jurisdiction in which your property is located when we commence the enforcement of our lien. Property may be sold or otherwise disposed of at the Warehouse or nearest suitable location to satisfy the applicable lien law. The personal property in the Container may be sold to satisfy the lien if you are in default. All moving, storage and/or sales costs associated with the sale of your property shall be your responsibility. As we have no knowledge of the contents stored in the Container, you hereby waive any obligation that we provide a description of the personal property in your Container, to the extent required by the applicable state lien laws."

¶ 31        Also relevant to this case is the notice provision of the Rental Agreement which provided as follows:

> "Except as otherwise expressly provided in this Agreement or as required by law, any written notices or demands required or permitted to be given under the terms of this Agreement may be personally served or may be served by first class mail or certified mail, deposited in the United States mail with postage thereon fully prepaid and addressed to the party to be served at the address of such party provided for in this Agreement. *** In the event you shall change your place of residence or alternate address from the place on the attached Addendum, you shall give us written notice of any such change within ten (10) days of the change, specifying your current address and telephone numbers. Failure to provide forwarding information in writing releases us of any damages that might occur in the event that the Container must be removed or in exercising our remedies upon an event of default, unless directly caused by our

fraud, willful misconduct or willful violation of the law. We assume no responsibility and will make no attempts to locate you if such information is unavailable."

¶ 32    Lisa believed that Pack-Rat picked up the loaded container from the Euclid Avenue residence on March 3, 2009. The monthly rental payment was charged on her MasterCard account on February 27, March 27, and April 27, 2009.

¶ 33    Prior to May 9, 2009, Pack-Rat notified Lisa that her storage container had been moved from Glendale Heights to its facility in Gurnee, Illinois. On May 9, 2009, Lisa called Pack-Rat's 800 number and spoke with an individual named Antonio. She informed him that instead of moving to their new home, they would be renting a place to live temporarily. Lisa inquired what the monthly charge would be, as the original three-month special rate had expired, and she wanted to provide Pack-Rat with the plaintiffs' rental address. Antonio gave Lisa the telephone number of the Gurnee warehouse, where she spoke with "Steve." After discussing the monthly charge and the redelivery charge with Steve, Lisa offered to provide him with the plaintiffs' rental address, but he told her to call the facility when she was ready to have the container delivered.

¶ 34    Due to compromised activity on her MasterCard, on May 13, 2009, Lisa was issued a new card with a new account number. Lisa acknowledged that she did not give Pack-Rat her new MasterCard account number, and she failed to notice that no rental charge appeared on her MasterCard account in May, June, July, or August 2009.

¶ 35    The plaintiffs signed a contract to sell the Euclid Avenue residence in late June or early July 2009. On June 27, 2009, the plaintiffs moved from the Euclid Avenue residence to their rental residence on Asbury Avenue, Winnetka, Illinois. Lisa filled out the post office change of address form and received mail forwarded from the Euclid address to the Asbury address. She did not recall receiving a letter from Pack-Rat on or about June 10, 2009, July 31, 2009, or August 2009, notifying her that her rental payments were past due. Lisa did not recall receiving an auction sale notice from Pack-Rat in September 2009 and denied receiving a certified letter from Pack-Rat in September 2009. She did not recall how long the telephone number of the Euclid Avenue residence remained in service.

¶ 36    In late September 2009, Lisa learned that the contents of the container had been sold at auction on September 18, 2009. She contacted Nathan Olson at Pack-Rat. Mr. Olson explained he had tried to reach her by telephone. Lisa told him she had not received any telephone calls, e-mails or notices from Pack-Rat and that she had attempted, albeit unsuccessfully, to provide Pack-Rat with the plaintiffs' rental address. She acknowledged that she did not provide alternative telephone numbers for the plaintiffs to Pack-Rat. Lisa further acknowledged that the delivery agreement required her to update her credit card information with Pack-Rat.

¶ 37    Stephen V. Redman (Steve) was the customer service representative at Pack-Rat's Gurnee facility at the time the plaintiffs' container was stored there. His duties included the delivery and moving of storage containers and submitting paperwork to the corporate office as the containers were delivered. Steve's training was on-the-job for the most part. He was trained on how to access customer information on the computer. Steve explained that, according to Pack-Rat policy, if a customer called to update information, the employee would make the requested changes, but only if the employee was available and had the time to make the changes. Otherwise, the customer would be directed to call the 800 number. When he delivered a container unit, Steve would tell customers to notify Pack-Rat once they had moved so that their files could be updated. He did not recall accessing or changing customer information

based on a telephone call from the customer. Steve did not recall a telephone conversation with Lisa.

¶ 38     On August 28, 2009, Pack-Rat sent a certified letter to the plaintiffs at the Euclid Avenue residence, advising them that the rental fees were more than 90 days past due and unless the amount was paid in full by September 18, 2009, the contents of the container would be offered for sale on that date. The certified letter was returned to Pack-Rat as unclaimed. On September 18, 2009, Auctions by Jennifer conducted the sale, and the contents of the plaintiffs' storage container were sold to Walter Dubin for $1,000. After the sale, Pack-Rat personnel discovered a letter with the address of Isaac's parents among the plaintiffs' unsold personal property. Pack-Rat contacted Isaac's parents, who informed Isaac of the sale. The plaintiffs attempted to recover their property, but the purchaser had sold their property on September 19, 2009.

¶ 39                                         V. Circuit Court Proceedings

¶ 40     On January 29, 2010, the plaintiffs filed a class action suit against the defendants for violations of section 4 of the Self-Service Storage Facility Act (Storage Act) (770 ILCS 95/4 (West 2008)), section 2 of the Consumer Fraud Act (815 ILCS 505/2 (West 2008)) and realleged their conversion and replevin claims. In their second amended complaint, the plaintiffs no longer sought class certification but alleged violations of the Consumer Fraud Act based on the defendants' failure to comply with the requirements of the Storage Act, breach of fiduciary duty, conversion, and replevin.

¶ 41     On March 8, 2012, the plaintiffs filed a motion for partial summary judgment on liability. They maintained that, as a matter of law, the defendants were collectively liable to them for violations of the Consumer Fraud Act and for conversion of their property under joint venture and direct participation theories.

¶ 42     On August 30, 2012, the circuit court granted the motion as to the conversion claim. The court noted that the rental agreement required the defendants to comply with the laws of the jurisdiction in which the property was located. If there was a violation of the Storage Act, the rental agreement did not give the defendants the authority to dispose of the plaintiffs' property. The court found that undisputed facts showed that the defendants failed to comply with the Storage Act as follows: the August 28, 2009, notice letter did not contain an itemized statement of the defendants' claim, the date the amount came due or a demand for payment within a specified time not less than 14 days after delivery of the notice (770 ILCS 95/4(C)(1), (C)(4) (West 2008)) and failed to comply with the timing requirements in section 4(E)(3) for a lien sale of a defaulting renter's personal property (770 ILCS 95/4(E)(3) (West 2008)). The circuit court denied the motion as to the Consumer Fraud Act, finding the record insufficient to determine if the defendants' conduct was oppressive or caused the plaintiffs substantial injury.

¶ 43     The circuit court also granted summary judgment to the plaintiffs on the multi-party liability. The court found the existence of a joint business venture between the WMS and Pack-Rat in the creation of WM IL and found WMS, Pack-Rat and WM Pack-Rat liable to the plaintiffs for any wrongdoing by WM IL. The court denied summary judgment as to the liability of WMI. After the defendants filed a motion for reconsideration, the circuit court amended its August 30, 2012, order and denied summary judgment to the plaintiffs as to any liability on the part of WM Pack-Rat.

¶ 44     On October 6, 2014, the defendants filed a motion for summary judgment on the plaintiffs' second amended complaint. On October 20, 2014, the plaintiffs filed their response to the

defendants' motion for summary judgment and a cross-motion for partial summary judgment on liability on their Consumer Fraud Act count. The plaintiffs did not contest the defendants' request for summary judgment as to the breach of fiduciary duty and replevin counts and as to the liability of WM Storage, Inc. II. On their Consumer Fraud Act count, the plaintiffs maintained that they were entitled to partial summary judgment as to liability against WM Pack-Rat and WMI. In the case of WM Pack-Rat, the plaintiffs alleged it was jointly and severally liable for the actions of WM IL. In the case of WMI, they alleged that WMI was a joint venture partner of Pack-Rat in causing damages to the plaintiff. The defendants filed a reply to the plaintiffs' response and cross-motion. With leave of court, the plaintiffs filed a surreply to respond to defendants' motion for summary judgment and a reply in support of their cross-motion for partial summary judgment as to liability. On November 13, 2014, the circuit court heard argument on the summary judgment and partial summary judgment motions and took the case under advisement.

¶ 45        On December 17, 2014, the circuit court issued its order and opinion. The court granted summary judgment to the defendants on the Consumer Fraud Act count, finding that the defendants' failure to comply with provisions of the Storage Act was not a *per se* violation of the Consumer Fraud Act, did not violate public policy, and was not unfair. The court further found no causal connection between the defendants' noncompliance and the injury to the plaintiffs.

¶ 46        The circuit court then addressed the liability of the defendants on the plaintiffs conversion claim. The court observed that the only theory for holding WMI liable for WM IL's conversion of the plaintiffs' property was to pierce the corporate veil between WMI and WMS. Since the parties had agreed that there was no basis in the evidence for that theory, the court granted summary judgment on WMI's liability on the conversion claim and dismissed WMI from the case.

¶ 47        The circuit court found no necessity to pierce the corporate veil between WM Pack-Rat and WM IL. The court noted that in its August 30, 2012, order, it had found that WMS and Pack-Rat may be held liable for WM IL's wrongdoing. The court denied the defendants' motion for summary judgment as to WM Pack-Rat's liability on the plaintiffs' conversion claim and denied the plaintiffs' motion for summary judgment to pierce the corporate veil between WM Pack-Rat and WM IL.

¶ 48        Turning to the issue of damages, the circuit court rejected the defendants' argument that they were entitled to summary judgment based on the limitation of damages provision in the rental agreement. The court found the limitation of damages provision violated public policy, and it was unclear that such a limitation would apply to a conversion claim. The court further found that while punitive damages may be awarded on conversion claims, the defendants' actions did not reach the level of willful and wanton disregard necessary for an award of punitive damages to be considered appropriate in this case.

¶ 49        The circuit court's order provided in pertinent part as follows:

> "1. Plaintiffs' Motion for Summary Judgment on their claim against all Defendants for violations of the Illinois Consumer Fraud Act is DENIED. Plaintiffs' Motion for Summary Judgment as to liability of Waste Management, Inc. and WM Pack-Rat, LLC for the acts of WM Pack-Rat of Illinois is DENIED.

> 2. Defendant's [*sic*] Motion for Summary Judgment on Plaintiffs' claims for (1) violation of the Illinois Consumer Fraud Act, (2) breach of fiduciary duty, (3) replevin

- 8 -

is GRANTED. Defendants' Motion for Summary Judgment as to no liability for Waste Management, Inc. and WM Storage II, Inc. is GRANTED. Defendants' Motion for Summary Judgment that punitive damages are unavailable is GRANTED.

3. Defendants' Motion for Summary Judgment as to no liability for WM Pack-Rat, LLC is DENIED. Defendants' Motion for Summary Judgment that damages are limited by the lease agreement is DENIED."

¶ 50    On January 6, 2015, the circuit court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), finding that there was no reason to delay enforcement or appeal of its December 17, 2014, order. This appeal followed.

¶ 51                                    ANALYSIS
¶ 52                              I. Standard of Review
¶ 53    The court applies the *de novo* standard of review to the disposition of a motion for summary judgment. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 309 (2010). " 'Summary judgment is proper if, and only if, the pleadings, depositions, admissions, affidavits and other relevant matters on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.' " *Wolinsky v. Kadison*, 2013 IL App (1st) 111186, ¶ 48 (quoting *Illinois Farmers Insurance Co. v. Hall*, 363 Ill. App. 3d 989, 993 (2006)). Where the parties have filed cross-motions for summary judgment, they invite the court to determine the issues as a matter of law and enter judgment in favor of one of the parties. *Mt. Hawley Insurance Co. v. Robinette Demolition, Inc.*, 2013 IL App (1st) 112847, ¶ 14.

¶ 54                                  II. Discussion
¶ 55                        A. Consumer Fraud Act Violations
¶ 56    "To state a cause of action under the Illinois Consumer Fraud Act, five elements must be proven: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for the plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 353 (2009). Of the five elements, only whether a deceptive act or unfair practice occurred and whether the plaintiffs' damages were proximately caused by the defendants' deceptive act or unfair practice are at issue.

¶ 57    The plaintiffs alleged that the defendants' failure to comply with provisions of the Storage Act governing the procedures to be followed in conducting a sale of a delinquent renter's property constituted an unfair business practice. See *Hill v. PS Illinois Trust*, 368 Ill. App. 3d 310, 319 (2006) (conduct may be unfair under the Consumer Fraud Act without being deceptive). They further alleged that the defendants' failure to follow their own internal procedures and the inadequacy of their procedures utilized in complying with the sale requirements of the Storage Act also constituted unfair business practices.

¶ 58    Whether conduct is unfair under the Consumer Fraud Act is determined on a case-by-case basis. *Dubey*, 395 Ill. App. 3d at 354. "The requirements for unfair conduct are: (1) whether the practice offends public policy; (2) whether it is oppressive; and (3) whether it causes consumers substantial injury." *Dubey*, 395 Ill. App. 3d at 354. A practice need not meet all

three criteria to be unfair. *Dubey*, 395 Ill. App. 3d at 354. "Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a less extent it meets all three." *Dubey*, 395 Ill. App. 3d at 354 (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 418 (2002)).

¶ 59     The plaintiffs contend that the defendants' failure to comply with the statutory waiting periods and notice provisions offended public policy. With respect to the Storage Act, the circuit court found that the defendants failed to comply with section 4 of the Storage Act in that (1) the notice of sale letter the defendants sent to the plaintiffs did not contain an itemized statement of the defendants' claim, the date the amount had become due, and a demand for payment within a specified time not less than 14 days after delivery of the notice; (2) the defendants did not allow for the statutorily required amount of time between the delivery of the notice letter and the publishing of advertisements for the lien sale, and (3) the defendants did not allow for the statutorily-required amount of time between the publication of notice and actual sale. 770 ILCS 95/4(C), (E)(3) (West 2008). The defendants do not contest the circuit court's findings that they failed to comply with the Storage Act.

¶ 60     In addition, the plaintiffs point out that the defendants did not follow their own procedures. Even though he was trained to do so, Steve refused Lisa's offer to provide Pack-Rat with the plaintiffs' rental address, failed to instruct her to call the 800 number to update her address information and failed to instruct her to fill out the change of address form used by the defendants. The defendants failed to utilize the telephone number or e-mail information Lisa provided them to contact the plaintiffs; and the defendants did not program their computer system used in generating notices to customers to conform to the notification requirements of the Storage Act.

¶ 61     The plaintiffs maintain that section 4 of the Storage Act expresses Illinois's public policy to protect the consumer by requiring notice that his property is at risk of being disposed of by the storage facility owner. In compliance with section 4(C) of the Storage Act, on August 28, 2009, the defendants sent a notice of sale by certified letter to the plaintiffs at the Euclid Avenue residence, their last known address. The August 28, 2009, notice was returned to the defendants as "unclaimed." The fact that the content of the notice was technically incorrect made no difference as the plaintiffs never read the contents of the notice.

¶ 62     With respect to the plaintiffs' contention that the defendants' prevented them from updating their address, section 2 of the Storage Act defines the last known address as "that address provided by the occupant in the latest rental agreement, or the address provided by the occupant in a subsequent written notice of a change of address." 770 ILCS 95/2(F) (West 2008). The Euclid Avenue residence address was set forth on the delivery ticket. Both section 2(F) of the Storage Act and the Rental Agreement required Lisa to give "written notice" of a change of address. While Steve could have entered the plaintiffs' rental address into the system or instructed her to call the 800 number, Lisa knew or should have known that written notification was required under the Rental Agreement and to invoke the protections under the Storage Act. Neither the Storage Act nor the rental agreement required the defendants to provide a change of address form.

¶ 63     The plaintiffs contend that the defendants' failure to utilize the telephone or e-mail address information provided by a customer was contrary to public policy, oppressive, and resulted in injury to the consumer. In February 2009, Lisa provided the defendants with a telephone number and an e-mail address; both were printed on the delivery ticket, part of the addendum

to the Rental Agreement. Lisa acknowledged that she did not provide written notice of the change of address to the defendants, and she was uncertain how long the telephone at the Euclid Avenue residence remained in service after the plaintiffs moved from there on June 27, 2009. Not only did Lisa fail to comply with the Rental Agreement provision to provide updated telephone and address information, the Rental Agreement specifically provided that, in the event that Lisa failed to provide the updated address and telephone information within 10 days of any change, "[Pack-Rat] assume[s] no responsibility and will make no attempts to locate you if such information is unavailable."

¶ 64 The plaintiffs do not contend that the "no effort to notify" provision of the Rental Agreement was contrary to public policy. They cite no authority requiring the defendants to do more than the Rental Agreement or the Storage Act required. See *Saunders v. Michigan Avenue National Bank*, 278 Ill. App. 3d 307, 315 (1996) (reviewing court rejected the plaintiff's reasonable expectations argument finding that "the express agreement between the parties clearly controls what expectations are reasonable").

¶ 65 The plaintiffs maintain that the public policy of Illinois requires that out-of -state corporations such as Pack-Rat comply with Illinois law citing section 13.10 of the Business Corporations Act of 1983 (805 ILCS 5/13.10 (West 2008)). Section 13.10 provides that foreign corporations are subject to the same duties, restrictions, penalties, and liabilities as domestic corporations. *Sprague v. Universal Voting Machine Co.*, 134 Ill. App. 379 (1907), cited by the plaintiffs, was filed prior to 1935 and therefore is not binding but only persuasive authority. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 32 n.4. In any event, in Sprague, the reviewing court noted that Illinois public policy was against trusts and business combinations organized for the purpose of suppressing competition. In that regard, foreign corporations were subject to the same restrictions and duties as domestic corporations. *Sprague*, 134 Ill. App. at 384.

¶ 66 The plaintiffs complain that the circuit court did not sufficiently consider whether the defendants' conduct was oppressive or caused substantial injury to consumers. To be oppressive, the conduct must leave the consumer with little alternative but to submit. *Saunders*, 278 Ill. App. 3d at 313. In *Dubey*, the reviewing court found the defendant's business practice oppressive where the defendant never served the plaintiff with the notice of lien or the notice of the auction of her property. *Dubey*, 395 Ill. App. 3d at 354.

¶ 67 In contrast to *Dubey*, the defendants in this case sent notice of the sale to the plaintiffs' last known address as required by the Storage Act. In addition, the Rental Agreement provided a procedure whereby the plaintiffs could maintain current contact information with the defendants. However, the plaintiffs failed to comply with the notification requirement in the Rental Agreement, which resulted in them not receiving notice of the sale. Moreover, unlike the plaintiff in *Dubey*, the plaintiffs had failed to make their rental payments on the storage unit because Lisa failed to provide the defendants with her new credit card number. See *Hill*, 368 Ill. App. 3d at 319-20 (the plaintiff stated a cause of action for violation of the Consumer Fraud Act where he alleged that he was never sent the statutory notice that the defendant would be seeking enforcement of its lien and had no reasonable opportunity to avoid the sale).

¶ 68 While the defendants' notices did not comply in all respects with the requirements of the Storage Act, but for the failure of the plaintiffs to comply with requirement that they provide a change of address in writing, the plaintiffs would have received notice of the lien and the scheduled sale of their property. Since the defendants' business practice did not deprive the

plaintiffs of a meaningful choice, in this case a reasonable opportunity to avoid the sale, the defendants' conduct was not oppressive.

¶ 69    The plaintiffs argue that the defendants' business practices caused substantial injury by not complying with the notice requirements of the Storage Act. They maintain that the defendants' Site Link Reminder System and the Step-by-Step procedure were set up to ensure compliance with the law in North Carolina, where Pack-Rat originally operated. The fact that the defendants failed to introduce procedures to ensure compliance with Illinois's Storage Act caused substantial injury to consumers by the enforcement of the lien and sale of their property. The plaintiffs point out that they provided the circuit court with evidence that in 17 other cases the defendants had failed to comply with the Storage Act notification requirements, but the court improperly discounted the evidence.

¶ 70    The plaintiffs rely on the deposition testimony of attorney Friedman, acknowledging that he never reviewed SiteLink to ensure compliance with local laws. On the other hand, Kevin Barbour testified that each state's timeline for notices was inputted into SiteLink. The plaintiffs failed to support their assertion that the defendants were applying North Carolina law in Illinois with a citation to the record on appeal. Moreover, the 17 other instances relied on by the plaintiffs were properly discounted by the circuit court because in order to recover on their claim, the plaintiffs must establish that defendants' actions proximately caused the plaintiffs' injury in this case. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 203 (2005) (claimant failed to prove a private right of action under the Consumer Fraud Act where he suffered no damage and failed to establish proximate causation). In the present case, even if the defendants' failure to comply with the Storage Act notification requirements was an unfair business practice, it was not the proximate cause of the plaintiffs' injuries.

¶ 71    The plaintiffs maintain that the circuit court placed too much emphasis on Lisa's failure to notify the defendants that her credit card number had been changed and her failure to comply with the written notification requirements of the Rental Agreement. Nonetheless, had Lisa complied with the requirement to update her credit card information, the plaintiffs would not have fallen behind on their rental payments in the first place. Had Lisa complied with the written notification requirements of the Rental Agreement, the plaintiffs would have received the August 28, 2009, notification of the lien and sale. Absent the plaintiffs' failures, the failure of the defendants to include certain information or comply with the timing requirements in their notifications would not have prevented the plaintiffs from taking action to avoid the loss of their possessions.

¶ 72    Since as a matter of law, the defendants' business practices were not the proximate cause of the plaintiffs' injuries, the defendants were entitled to summary judgment on the plaintiffs' Consumer Fraud Act claim. The circuit court's order granting summary judgment to the defendants and denying summary judgment to the plaintiffs on their Consumer Fraud Act claim was correct.

¶ 73                                     B. Liability of WMI For WM IL

¶ 74    The plaintiffs contend that the circuit court erred when it ruled that as a matter of law, WMI was not liable for the conduct of WM IL. The plaintiffs argue that the Definitive Agreement established that WMI was a partner in a joint venture with Pack-Rat and therefore, liable for the actions of WM IL in converting the plaintiffs' possessions.

¶ 75    "A joint venture is an association of two or more entities to carry out a single, specific purpose for a profit." *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 80 (2008). The existence of a joint venture is dependent upon the intentions of alleged joint venturers. *Daniels*, 382 Ill. App. 3d at 80. In determining the parties' intention to enter into a joint venture, the court considers the following: "(1) a community of interest, (2) a proprietary interest in the subject matter, (3) a right to direct and govern the policy, and (4) a sharing in both the profits and losses." *Daniels*, 382 Ill. App. 3d at 80. " 'Possibly, the most important criterion of a joint venture is joint control and management of the property used in accomplishing its aims.' " *Daniels*, 382 Ill. App. 3d at 80 (quoting *Herst v. Chark*, 219 Ill. App. 3d 690, 694 (1991)). The proponent of the existence of the joint venture has the burden of proving that the parties intended such a relationship. *Daniels*, 382 Ill. App. 3d at 80. All four criteria must be established or a joint venture does not exist. *Daniels*, 382 Ill. App. 3d at 80. The Definitive Agreement provisions fail to establish that WMI was a participant in the joint venture with Pack-Rat so as to be liable for the actions of WM IL.

¶ 76    The Definitive Agreement specifically provided that WMI was a party to the Definitive Agreement solely as a guarantor of its obligations to provide financing. We also find that the plaintiffs' argument that WMI and Pack-Rat shared a community of interest unsupported by the evidence. While attorney Friedman testified at his deposition that Pack-Rate sought to expand its business and was interested in working with developers, he could not speak for what WMI was seeking in the negotiations between the two. His testimony that WMI was interested in developing its property holdings was based on what a successful company would do and therefore, mere speculation. We further find no evidence that WMI, as opposed to WMS, exercised joint control and management with Pack-Rat. Under the Definitive Agreement, as an "affiliate" of WMS, WMI was given opportunities, such as participation in Pack-Rat's "buy-back" option and favorable treatment if it wished to develop a territory already under contract by another developer and to develop new products. In addition, WMI was entitled to first notice of Pack-Rat's decision to sell assets. With respect to Pack-Rat's board of directors, it was WMS that was permitted to have an observer present at board meetings and upon the opening of 20 Pack-Rat facilities, it was WMS that was permitted to have one voting member.

¶ 77    The plaintiffs cite *Smith v. Metropolitan Sanitary District of Greater Chicago*, 77 Ill. 2d 313 (1979), *Daniels*, and *Groark v. Thorleif Larsen & Son, Inc.*, 231 Ill. App. 3d 61 (1992), for general principles applicable to the creation of joint ventures. But the plaintiffs provide no analysis of those cases relevant to the present case.

¶ 78    We conclude that as a matter of law the plaintiffs failed to establish the criteria necessary to show that WMI and Pack-Rat were parties to a joint venture that ultimately resulted in the creation of WM IL by WM Pack-Rat. Since as a matter of law WMI was not liable for the actions of WM IL, the circuit court's award of summary judgment to the defendants and denial of summary judgment to the plaintiffs on the issue of WMI's liability for the actions of WM IL was correct.

¶ 79                                    C. Punitive Damages

¶ 80    The plaintiffs contend that the circuit court erred when it granted summary judgment to the defendants, finding as a matter of law that the plaintiffs were not entitled to an award of punitive damages for the conversion of their property by the defendants.

¶ 81    Punitive damages serve to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). Under the proper circumstances the tort of conversion will support an award of punitive damages. *Dubey*, 395 Ill. App. 3d at 355. "Punitive damages for the tort of conversion properly lie where the defendant acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others." *Dubey*, 395 Ill. App. 3d at 355. The initial decision whether punitive damages may be imposed in a particular case is a matter normally reserved to the trial judge. *Loitz*, 138 Ill. 2d at 414.

¶ 82    The plaintiffs maintain that the defendants acted with willful disregard to their Illinois customers by failing to research and implement Illinois law to ensure compliance with the Storage Act in asserting and enforcing a lien claim. Specifically, they alleged that the evidence established that SiteLink was not reviewed to ensure that it complied with the state law in its new locations, SiteLink did not comply with the notification requirements of the Storage Act, the Step-by-Step procedure did not comport with the Storage Act, Mr. Olson received no training in the enforcement of the defendants' lien rights, and there was no management review of Mr. Olson's actions taken in enforcing the lien against the plaintiffs' property prior to the sale.

¶ 83    Punitive damages are not awarded for acts that constitute ordinary negligence, such as mere inadvertence, mistake, and errors of judgment. *Loitz*, 138 Ill. 2d at 415. The court in *Loitz* explained:

> "Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. [Citation.] In this context, willful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." (Internal quotation marks omitted.) *Loitz*, 138 Ill. 2d at 415-16 (quoting Restatement (Second) of Torts § 908 cmt. b, at 464-65 (1979), and *Bresland v. Ideal Roller & Graphics Co.*, 150 Ill. App. 3d 445, 457 (1986)).

¶ 84    The plaintiffs rely solely on *Dubey*. In that case, this court found that an award of punitive damages was not an abuse of discretion where the evidence established that the defendant rented the plaintiff a storage unit that it had rented to a another individual, changed the unit number on the contract the plaintiff signed, failed to instruct the plaintiff not to store more than $5000 worth of property in the unit, failed to correct the mistake in the unit numbers after discovering it, and auctioned off the plaintiff's property without notifying her. *Dubey*, 395 Ill. App. 3d at 356. This court determined that there was ample evidence to support the conclusion that the defendant acted willfully or with such gross negligence to indicate a wanton disregard for the rights of others. *Dubey*, 395 Ill. App. 3d at 356.

¶ 85    The defendants respond that the conduct cited by the plaintiffs did not reach the level necessary for the imposition of punitive damages. In *Cruthis v. Firstar Bank, N.A.*, 354 Ill. App. 3d 1122 (2004), the bank was found to have converted the plaintiffs' funds when it withdrew funds from the plaintiffs' checking account solely on the unsupported request of

another bank and without notifying or obtaining permission from the plaintiffs to withdraw the funds or to trigger their overdraft protection. The bank refused to return the funds to the plaintiffs claiming, incorrectly, that the funds had been removed due to the wife's termination from employment. *Cruthis*, 354 Ill. App. 3d at 1133.

¶ 86 The reviewing court agreed with the trial court that the evidence demonstrated the bank's "lack of good judgment, not willful and wanton conduct, when it withdrew the funds from the plaintiffs' account and returned them to [the employer]." *Cruthis*, 354 Ill. App. 3d at 1133. Ultimately, the bank credited the plaintiffs' account for fees and interest charges. While the evidence supported the jury's determination that the bank had committed conversion, it did not support the jury's determination that the bank "behaved with an evil motive or with reckless indifference to the plaintiffs' rights." *Cruthis*, 354 Ill. App. 3d at 1134.

¶ 87 The defendants maintain that the failure to train Mr. Olson does not support an award of punitive damages. In *Spires v. Mooney Motors, Inc.*, 229 Ill. App. 3d 917 (1992), the reviewing court found that the defendant allowed an employee to change a tire, despite the fact that the employee was not sufficiently trained and the defendant knew or should have known that the employee was using damaged equipment, the tire was probably defective, and the employee was installing the tire without using a protective shield. The reviewing court upheld summary judgment for the defendant, finding those facts insufficient to support an award of punitive damages. *Spires*, 229 Ill. App. 3d at 923-24.

¶ 88 The defendants also rely on *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill. App. 3d 915 (1981). In that case, acting with the advice of legal counsel, the defendant sold the plaintiff's property believing, mistakenly as it turned out, that under its lease with the plaintiff, the plaintiff's failure to remove his equipment within the time specified authorized the defendant to take title to and dispose of the equipment. *Jensen*, 94 Ill. App. 3d at 937. The court noted that the defendant notified the plaintiff that he must move his equipment or it would be sold for scrap. The reviewing court found that the defendant's conduct did not "reflect an intentional or wanton disregard of the plaintiff's rights." *Jensen*, 94 Ill. App. 3d at 937. With respect to the lack of communication prior to the sale and inconsistent representations by the defendant's agents, the reviewing court deemed them careless but that they did not amount to "willful or wanton conduct." *Jensen*, 94 Ill. App. 3d at 937. The court held that the trial court abused its discretion when it submitted the issue of punitive damages to the jury. *Jensen*, 94 Ill. App. 3d at 938.

¶ 89 The circuit court determined that the defendants' conduct demonstrated a lack of good judgment and reflected negligence. As a result, it found the defendants had committed the intentional tort of conversion. Unlike the defendant in *Dubey*, the defendants sent notice of the lien and sale to the plaintiffs at what the defendants believed was the plaintiffs' last known address. Mr. Olson's lack of training or use of SiteLink did not prevent the August 28, 2009, notice to the plaintiffs from being sent. Once it was returned as unclaimed, the Rental Agreement did not require the defendants to continue their efforts to contact the plaintiffs. Despite having no obligation to do so, when the defendants obtained the contact information for the plaintiffs, they utilized it to reach the plaintiffs. Such efforts cannot be characterized as indicative of an evil motive or indifference to the rights of the plaintiffs.

¶ 90 The plaintiffs argue that the circuit court's ruling on punitive damages was flawed because it applied the same definition of willful misconduct to find that the Rental Agreement's limitation on damages provision did not apply where the defendants voluntarily and

intentionally auctioned the plaintiffs' property without authorization under the Storage Act. The court then used the same definition to find that punitive damages were not appropriate in this case.

¶ 91 We find no inconsistency. There is no question that the defendants acted voluntarily and intentionally in auctioning the plaintiffs' property, since that is the basis for finding that they had converted the plaintiffs' property. However, in order to determine if punitive damages are appropriate, the conduct must not just be willful, but that the defendant acted willfully or with such gross negligence to indicate a wanton disregard for the rights of others. *Dubey*, 395 Ill. App. 3d at 356. Such conduct is not present under the uncontested facts of this case.

¶ 92 Finally, the plaintiffs maintain that it was improper for the circuit court to consider its ruling on the plaintiffs' Consumer Fraud Act claim in determining whether the punitive damages were appropriate in this case. We review the circuit court's judgment, not the reasoning the court employed. *Canada Life Assurance Co. v. Salwan*, 353 Ill. App. 3d 74, 79 (2004). We determine whether the circuit court reached the proper result. *Salwan*, 353 Ill. App. 3d at 79. The circuit court's reasons for its decision or its findings on which its decision is based are not material if the judgment is correct. *Salwan*, 353 Ill. App. 3d at 79. As a reviewing court, we can sustain the decision of the circuit court on any grounds called for by the record regardless of whether the circuit court relied on the grounds and regardless of whether the court's reasoning was sound. *Salwan*, 353 Ill. App. 3d at 79. While we agree with the plaintiffs that the two issues are dissimilar, the court's ruling that an award of punitive damages was not appropriate in this case was correct.

¶ 93 D. Liability of WM Pack-Rat for the Actions of WM IL

¶ 94 The plaintiffs contend that they were entitled to summary judgment on the issue of WM Pack-Rat's liability for the acts of WM IL. The plaintiffs and the defendants filed cross-motions for summary judgment on that issue. Contrary to the statement in the plaintiffs' opening brief, the circuit court denied both motions. Therefore, the defendants maintain that this court lacks jurisdiction to rule on this issue.

¶ 95 The denial of a summary judgment motion is not a final order and is normally not appealable even where the court has made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). *Eakins v. Hanna Cylinders, LLC*, 2015 IL App (2d) 140944, ¶ 36. An exception exists where the parties have filed cross-motions for summary judgment and the circuit court has granted one, disposing of all the issues in the case. *Eakins*, 2015 IL App (2d) 140944, ¶ 36.

¶ 96 Here, the parties filed cross-motions for summary judgment, but the circuit court denied both motions. Therefore, we agree with the defendants that we lack jurisdiction to rule on the liability of WM Pack-Rat for the actions of WM IL.

¶ 97 CONCLUSION

¶ 98 For all of the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 99 Affirmed.