2020 IL App (2d) 190879
No. 2-19-0879
Opinion filed December 4, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| DANIEL D. EASTERDAY, ILLINOIS STATE RIFLE ASSOCIATION, and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 18-CH-427 |
| THE VILLAGE OF DEERFIELD, | ) ) | Honorable Luis A. Berrones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| GUNS SAVE LIFE, INC., and JOHN WILLIAM WOMBACHER III, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 18-CH-498 |
| THE VILLAGE OF DEERFIELD and HARRIET ROSENTHAL, in Her Official Capacity as Mayor of the Village of Deerfield, | ) ) ) ) | Honorable Luis A. Berrones, |
| Defendants-Appellants. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice Hudson concurred in the judgment and opinion.
Justice McLaren concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 The plaintiffs in these consolidated actions challenge the Village of Deerfield's bans of "assault weapons" and "large capacity magazines." One set of plaintiffs—Daniel D. Easterday, the Illinois State Rifle Association, and the Second Amendment Foundation, Inc. (collectively, Easterday)—sued Deerfield. The other set of plaintiffs—Guns Save Life, Inc. and John William Wombacher III (collectively, Guns Save Life)—sued both Deerfield and its mayor, Harriet Rosenthal. For the sake of simplicity, we will refer to both defendants collectively as Deerfield. The trial court granted summary judgment in favor of plaintiffs and permanently enjoined Deerfield from enforcing its bans of assault weapons and large capacity magazines. Deerfield appeals. For the following reasons, we affirm in part and reverse in part the trial court's orders granting summary judgment in favor of plaintiffs. We vacate the permanent injunctions in part and remand the cause for further proceedings consistent with this opinion.

¶ 2                                I. BACKGROUND

¶ 3 Deerfield is a home rule unit. Before 2013, it did not have an ordinance in place regulating assault weapons or large capacity magazines.

¶ 4 Effective July 9, 2013, the Illinois legislature enacted the Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/1 *et seq.* (West 2018)) and amended section 13.1 of the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/13.1 (West 2018)). Deerfield interpreted this legislation as providing a brief window for home rule units to regulate assault weapons. Deerfield understood that if it failed to regulate such weapons by July 20, 2013, it would forever lose its power to do so. Although Deerfield was not ready to impose a total ban on assault weapons, it did not want to lose its regulatory authority on this matter. Deerfield believed that if it timely regulated assault weapons, it could amend those regulations at any time and in any manner it wished.

¶ 5    Consistent with its interpretation of the relevant legislation, on July 1, 2013, Deerfield enacted ordinance No. O-13-24 (the 2013 ordinance), which regulated the storage and transportation of assault weapons within the village. Deerfield defined "assault weapon" by reference to a list of both physical characteristics of firearms and specified models. See Deerfield Municipal Code § 15-86 (added July 1, 2013). Deerfield defined "large capacity magazine" as

"any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

(1) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

(2) A 22 caliber tube ammunition feeding device.

(3) A tubular magazine that is contained in a lever-action firearm."

Deerfield Municipal Code § 15-86 (added July 1, 2013).

Deerfield specified certain requirements for the safe storage and transportation of assault weapons. See Deerfield Municipal Code §§ 15-87, 15-88 (added July 1, 2013). Failure to comply with those requirements would result in a fine between $250 and $1000. Deerfield Municipal Code § 15-89 (added July 1, 2013).

¶ 6    In 2018, following numerous highly publicized mass shootings across the country, Deerfield decided to enact what amounted to a total civilian ban on assault weapons and large capacity magazines. This was accomplished through two ordinances: Deerfield Ordinance No. O-18-06 (eff. Apr. 2, 2018) and Deerfield Ordinance No. O-18-19 (eff. June 18, 2018) (collectively, the 2018 ordinances).[1] The 2018 ordinances amended the sections of the municipal code that were

_____

[1] Early in this litigation, the trial court determined that, contrary to what Deerfield claimed,

added by the 2013 ordinance. Changes to the text of the municipal code were reflected by striking out language that was to be removed and underlining language to be added. Specifically, Deerfield made it unlawful for persons other than military or law enforcement personnel to "possess, bear, manufacture, sell, transfer, transport, store or keep any assault weapon or large capacity magazine in the Village." Deerfield Municipal Code § 15-87(a) (amended June 18, 2018). Deerfield provided a 60-day grace period for persons in possession of assault weapons or large capacity magazines to either (1) remove, sell, or transfer those items from the limits of the village, (2) render the items permanently inoperable or otherwise modify them so that they no longer fell within the definitions of prohibited items, or (3) surrender the items to the chief of police for disposal and destruction. Deerfield Municipal Code §§ 15-90, 15-91 (added Apr. 2, 2018).

¶ 7    Easterday and Guns Save Life filed separate lawsuits challenging the validity of the 2018 ordinances.[2] The Easterday action was designated in the trial court as case No. 18-CH-427 and the Guns Save Life action was designated as No. 18-CH-498. The trial court entered temporary restraining orders in both cases prohibiting Deerfield from enforcing the bans. On July 27, 2018, the court consolidated the two actions "for all future proceedings."

---

ordinance No. O-18-06 did not ban large capacity magazines. In response to that ruling, Deerfield enacted ordinance No. O-18-19, which explicitly banned large capacity magazines.

[2] In their original complaints, Easterday and Guns Save Life challenged ordinance No. O-18-06. When Deerfield subsequently enacted ordinance No. O-18-19, Easterday and Guns Save Life amended their complaints to challenge that ordinance as well. In its amended complaint, Easterday misidentified ordinance No. O-18-19 as ordinance No. O-18-24-3.

¶ 8    In their respective amended complaints, Easterday and Guns Save Life alleged that the bans imposed by the 2018 ordinances were preempted by section 13.1 of the FOID Card Act (430 ILCS 65/13.1 (West 2018)) and section 90 of the Concealed Carry Act (430 ILCS 66/90 (West 2018)). Easterday advanced this theory in a single count, whereas Guns Save Life advanced this theory in two counts (counts I and III of its amended complaint). Guns Save Life further alleged that the ordinances (1) were preempted by section 2.1 of the Wildlife Code (520 ILCS 5/2.1 (West 2018)) (counts II and IV of Guns Save Life's amended complaint) and (2) amounted to improper "takings" in violation of the Illinois Constitution (Ill. Const. 1970, art. I, § 15) (count V) and the Eminent Domain Act (735 ILCS 30/90-5-20 (West 2018)) (count VI).

¶ 9    On March 22, 2019, in response to Easterday's and Guns Save Life's motions for summary judgment, the trial court entered permanent injunctions in both cases enjoining Deerfield from "enforcing any provision of [the 2018 ordinances] making it unlawful to keep, possess, bear, manufacture, sell, transfer or transport assault weapons or large capacity magazines as defined in these ordinances." The court determined that the bans imposed by the 2018 ordinances were preempted by section 13.1 of the FOID Card Act and section 90 of the Concealed Carry Act. The court found, however, that genuine issues of material fact precluded summary judgment on Guns Save Life's claims that the bans amounted to improper "takings." The court also rejected Guns Save Life's argument that the bans were preempted by the Wildlife Code. The effect of these orders was to (1) grant summary judgment to Easterday as to the only claim that was at issue in its amended complaint, (2) grant summary judgment to Guns Save Life as to counts I and III of its amended complaint, and (3) deny Guns Save Life's motion for summary judgment as to counts II, IV, V, and VI of its amended complaint. Neither of the court's orders entered on March 22, 2019,

included language rendering the matters immediately appealable pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016).

¶ 10    Deerfield attempted to appeal the permanent injunctions pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). On June 12, 2019, we dismissed that appeal for lack of jurisdiction, because (1) Rule 307(a)(1) does not apply to permanent injunctions, (2) no final judgment was entered with respect to Guns Save Life's amended complaint, as the trial court did not resolve all claims, and (3) due to the lack of a complete record, we could not determine whether a final and independently appealable judgment had been entered with respect to Easterday's amended complaint. See *Easterday v. Village of Deerfield*, 2019 IL App (2d) 190320-U, ¶ 43 (*Easterday I*).

¶ 11    On that last point, we explained:

> " 'Illinois courts have recognized three distinct forms of consolidation: (1) where several actions are pending involving the same subject matter, the court may stay proceedings in all but one of the cases and determine whether the disposition of one action may settle the others; (2) where several actions involve an inquiry into the same event in its general aspects, the actions may be tied together, but with separate docket entries, verdicts and judgment, the consolidation being limited to a joint trial; and (3) where several actions are pending which might have been brought as a single action, the cases may be merged into one action, thereby losing their individual identity, to be disposed of as one suit.' " *Easterday I*, 2019 IL App (2d) 190320-U, ¶ 40 (quoting *Busch v. Mison*, 385 Ill. App. 3d 620, 624 (2008)).

Because the trial court did not stay any proceedings, we ruled out the first form of consolidation. *Easterday I*, 2019 IL App (2d) 190320-U, ¶ 40.

¶ 12    We noted that the difference between the second and third forms of consolidation had jurisdictional implications:

"Where the second form of consolidation applies, a final judgment entered in one of the actions is immediately appealable without a Rule 304(a) finding. [Citation.] In fact, the aggrieved party *must* immediately appeal the final order in that first action, as opposed to waiting until the companion action is resolved. [Citations.] Where, however, the third form of consolidation applies and the two actions merge into one, unless the trial court makes a Rule 304(a) finding, the aggrieved party may not appeal until all claims have been adjudicated. [Citations.] In considering which form of consolidation applies in a given case, reviewing courts have looked to the reasons for consolidation proposed by the litigants in their motions for consolidation. [Citations.] Other relevant considerations may include the wording of the consolidation order [citation], whether the cases maintained separate docket entries after consolidation, and whether the litigants were treated as parties in both cases." (Emphasis in original.) *Easterday I*, 2019 IL App (2d) 190320-U, ¶ 41.

¶ 13    Given that Deerfield erroneously pursued its appeal under Rule 307(a)—which contemplates a more limited supporting record as compared to appeals from final judgments—we were unable "to determine which form of consolidation the trial court intended." *Easterday I*, 2019 IL App (2d) 190320-U, ¶ 40. We concluded:

"Irrespective of whether the two actions merged, Deerfield's *** appeal of the permanent injunction that was entered in the Guns Save Life action is premature. If the two actions merged, Deerfield *** may not appeal until the resolution of all claims in both actions (or until the trial court enters a Rule 304(a) finding as to the permanent injunction in the Guns Save Life action). If the two actions did not merge, Deerfield *** may not

appeal until the resolution of all claims in the Guns Save Life action (or until the trial court enters a Rule 304(a) finding as to the permanent injunction in the Guns Save Life action). \*\*\*.

With respect to Deerfield's appeal of the permanent injunction that was entered in the Easterday action, however, the appeal is premature only if the two actions merged. If the two actions merged, Deerfield may not appeal until the resolution of all claims in both actions (or until the trial court enters a Rule 304(a) finding as to the permanent injunction in the Easterday action). (If the two actions did not merge, Deerfield's failure to establish that fact in the present appeal is fatal to any appeal in the Easterday action.)" *Easterday I*, 2019 IL App (2d) 190320-U, ¶¶ 44-45.

¶ 14 Following our decision in *Easterday I*, Deerfield filed a motion in the trial court requesting Rule 304(a) findings with respect to the March 22, 2019, orders entered in both the Easterday action and the Guns Save Life action. As noted above, on March 22, 2019, the court had resolved the only claim that was at issue in the Easterday action. Concerning the Guns Save Life action, Deerfield requested Rule 304(a) findings as to the court's rulings only on counts I through IV of the amended complaint (the preemption claims, not the takings claims). Deerfield also asked the court to find that the July 27, 2018, consolidation order merged the two cases. In their responses to Deerfield's motion, both Easterday and Guns Save Life argued that the consolidation order had not merged the actions.

¶ 15 On September 6, 2019, the court made Rule 304(a) findings as requested by Deerfield. The court also clarified that it had intended to merge the two actions when it entered the consolidation order. In explaining its decision, the court mentioned that certain limitations in the court clerk's case management system prevented multiple cases from being merged into one case number.

¶ 16    On October 3, 2019, Deerfield filed a notice of appeal, specifying its intent to challenge the permanent injunctions that the court entered on March 22, 2019, which were rendered appealable by the September 6, 2019, order.

¶ 17                                II. ANALYSIS

¶ 18                                A. Jurisdiction

¶ 19    Easterday and Guns Save Life both contend that we lack jurisdiction.

¶ 20    Easterday argues as follows. There are numerous objective indications from the record that suggest that the trial court's July 27, 2018, consolidation order was for judicial convenience and economy, not to merge the cases. Because Deerfield failed to appeal the final order entered in the Easterday action within 30 days of March 22, 2019, we lack jurisdiction of the present appeal.[3]

¶ 21    Guns Save Life presents a very similar jurisdictional argument. Guns Save Life emphasizes the unfairness of the trial court's after-the-fact explanation about its intent to merge the actions. Like Easterday, Guns Save Life argues that the cases did not merge and Deerfield, therefore, failed to timely appeal the final judgment in the Easterday action. According to Guns Save Life, because its action involves a permanent injunction that is identical to the one that was entered in the Easterday action, any appeal of the Guns Save Life action is moot and barred by collateral estoppel.

---

[3] Deerfield *did* file a notice of appeal within 30 days of the March 22, 2019, orders. As explained above, we dismissed Deerfield's first appeal for lack of jurisdiction. Thus, it appears that Easterday's argument is that we lack jurisdiction of the present appeal because we had jurisdiction in the prior appeal of a final judgment in the Easterday action, and Deerfield failed to establish that fact at the time.

¶ 22 Deerfield maintains that we have jurisdiction under Rule 304(a). According to Deerfield, Easterday and Guns Save Life did not file cross-appeals, so they may not challenge the trial court's finding that the actions merged. Deerfield further notes that the trial court expressly stated that it intended to merge the actions. Deerfield argues that this distinguishes the matter from the various cases cited by Easterday and Guns Save Life, where the appellate court was tasked with ascertaining trial judges' intent from the circumstantial evidence in the record.

¶ 23 In our view, contrary to Deerfield's suggestions, Easterday and Guns Save Life did not need to file cross-appeals to raise this issue. It would have been inappropriate for them to file cross-appeals because they obtained by summary judgment all the relief that they requested: a declaratory judgment in their favor as to the invalidity of the bans imposed by the 2018 ordinances and a permanent injunction barring Deerfield from enforcing those bans. See *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983) (an appellee may challenge specific findings made by the trial court without filing a cross-appeal, so long as "the judgment of the trial court was not at least in part against the appellee"); *Chicago Tribune v. College of Du Page*, 2017 IL App (2d) 160274, ¶ 28 (although it was improper for the appellee to file a cross-appeal from an order granting summary judgment in its favor, we noted that we could consider the appellee's contention that portions of the trial court's reasoning were erroneous, because an appellee may defend the judgment on any basis appearing in the record). Moreover, the issue that Easterday and Guns Save Life raise implicates our jurisdiction, so it is not subject to waiver or forfeiture. See *Ruff v. Industrial Comm'n*, 149 Ill. App. 3d 73, 78 (1986) (even without filing a cross-appeal, the employer-appellee was permitted to argue that the appellant did not file a timely petition before the Industrial Commission, as that argument raised questions regarding the jurisdiction of both the Industrial Commission and the appellate court).

¶ 24   We determine that there is no basis to overturn the trial court's finding that the actions merged. This case is unusual. In the more typical case, the appellate court must ascertain the trial court's intent by looking at circumstantial factors in the record, such as the ones that we outlined in *Easterday I.* Here, however, there is no room to argue about the trial court's intent because the court expressly stated that it intended to merge the actions. We recognize that the court clarified its intent only after the jurisdictional implications became apparent to both the court and the parties. We also recognize that the court mentioned certain limitations in Lake County's case management system that the parties may have had no reason to know about when the consolidation order was entered. Nevertheless, we find no prejudice to any party. Guns Save Life poses a hypothetical scenario in which a trial judge leads the parties to believe that two matters merged, only to later explain, once it was too late for the losing party to appeal, that the matters did not merge. Here, however, there is no unfairness, as the litigants are being granted access to the appellate court rather than foreclosed from such access.

¶ 25   Having no basis to disturb the trial court's finding that the two actions merged, Easterday's and Guns Save Life's jurisdictional challenges fail. Specifically, because the actions merged, Deerfield did not miss its opportunity to appeal the March 22, 2019, final judgment in the Easterday action. Because Deerfield did not miss its opportunity to appeal the final judgment in the Easterday action, the appeal of the March 22, 2019, order entered in the Guns Save Life action is neither moot nor barred by collateral estoppel. The March 22, 2019, order in the Easterday action was rendered appealable on September 6, 2019, when the trial court made findings under Rule 304(a). The court's March 22, 2019, rulings on counts I and III of Guns Save Life's amended complaint likewise were rendered appealable on September 6, 2019, when the court made findings

under Rule 304(a).[4] Deerfield appealed within 30 days of September 6, 2019. Accordingly, we have jurisdiction of the appeal under Rule 304(a).

¶ 26                                    B. Preemption

¶ 27     The trial court granted summary judgment in favor of Easterday and Guns Save Life, determining that the bans imposed by the 2018 ordinances were preempted by section 13.1 of the FOID Card Act and section 90 of the Concealed Carry Act. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). We review *de novo* the trial court's decision. *Guns Save Life, Inc. v. Ali*, 2020 IL App (1st) 181846, ¶ 43.

¶ 28     When interpreting a statute, our goal is to ascertain and effectuate the legislature's intent. *Iwan Ries & Co. v. City of Chicago*, 2019 IL 124469, ¶ 19. The plain and ordinary meaning of the statutory language is the most reliable indicator of that intent. *Iwan Ries*, 2019 IL 124469, ¶ 19. We must consider the statute as a whole, construing words and phrases in their proper context rather than in isolation. *Iwan Ries*, 2019 IL 124469, ¶ 19. We may consider both the subject of the statute and the legislature's apparent purpose in enacting it. *Iwan Ries*, 2019 IL 124469, ¶ 19. If it is possible to do so, we should embrace an interpretation that gives a reasonable meaning to each word, clause, and sentence of the statute without rendering any language superfluous. *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 25. Where the statute's

_____

[4] As explained below in section II.B.7., the court's Rule 304(a) findings did not render appealable the nonfinal orders as to counts II and IV of Guns Save Life's amended complaint.

language is clear and unambiguous, we apply it as written without resorting to extrinsic aids of construction. *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 16.

¶ 29                    1. *Nature of Home Rule Authority*

¶ 30    Before turning to the statutes at issue, we will provide some background about the nature of home rule authority, as it will inform our analysis. "Under the 1870 Illinois Constitution, the balance of power between our state and local governments was heavily weighted toward the state." *City of Chicago v. Stubhub, Inc.*, 2011 IL 111127, ¶ 18. With the adoption of the current Constitution in 1970, that balance of power was drastically altered, such that local governments "now enjoy 'the broadest powers possible.' " *Stubhub*, 2011 IL 111127, ¶ 18 (quoting *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992)). The impetus for this power transfer was "the assumption that municipalities should be allowed to address their problems by tailoring solutions to local needs." *Iwan Ries*, 2019 IL 124469, ¶ 21. To that end, article 7, section 6(a) of the Illinois Constitution provides, in relevant portion:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

The Constitution indicates that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 31    Nevertheless, the legislature retains the authority to restrict the powers of home rule units. Article 7, section 6(h), for example, allows the legislature to "provide specifically by law for the

exclusive exercise by the State of any power or function of a home rule unit."[5] Ill. Const. 1970, art. VII, § 6(h). Article 7, section 6(i) establishes that home rule units may exercise their powers concurrently with the State, to the extent that the legislature "does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i). Thus, the legislature must expressly limit or deny home rule authority whenever it intends to do so. *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 31; see also 5 ILCS 70/7 (West 2018) ("No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit *** unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit."). "In other words, the default position for a home rule unit is to be able to legislate local matters," and "the legislature's silence on the power of home rule units is actually evidence of the home rule unit's power." *Accel Entertainment Gaming, LLC v. Village of Elmwood Park*, 2015 IL App (1st) 143822, ¶ 47.

¶ 32                    2. *The Governing Statutes*

¶ 33    As mentioned above, the Concealed Carry Act went into effect on July 9, 2013. Section 90 of that Act provides:

> "The regulation, licensing, possession, registration, and transportation of handguns and ammunition for handguns by licensees are exclusive powers and functions of the State. Any ordinance or regulation, or portion thereof, enacted on or before the effective date of this Act that purports to impose regulations or restrictions on licensees or handguns and

---

[5] This rule is subject to certain exceptions relating to taxing powers. Those exceptions are not relevant to this appeal.

ammunition for handguns in a manner inconsistent with this Act shall be invalid in its application to licensees under this Act on the effective date of this Act. This Section is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution." 430 ILCS 66/90 (West 2018).

"Handgun" is defined as

"any device which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas that is designed to be held and fired by the use of a single hand. 'Handgun' does not include:

(1) a stun gun or taser;

(2) a machine gun as defined in item (i) of paragraph (7) of subsection (a) of Section 24-1 of the Criminal Code of 2012;

(3) a short-barreled rifle or shotgun as defined in item (ii) of paragraph (7) of subsection (a) of Section 24-1 of the Criminal Code of 2012; or

(4) any pneumatic gun, spring gun, paint ball gun, or B-B gun which expels a single globular projectile not exceeding .18 inch in diameter, or which has a maximum muzzle velocity of less than 700 feet per second, or which expels breakable paint balls containing washable marking colors." 430 ILCS 66/5 (West 2018).

¶ 34　Effective July 9, 2013, the legislature also amended section 13.1 of the FOID Card Act. That provision now reads as follows:

"(a) Except as otherwise provided in the Firearm Concealed Carry Act and subsections (b) and (c) of this Section, the provisions of any ordinance enacted by any municipality which requires registration or imposes greater restrictions or limitations on

the acquisition, possession and transfer of firearms than are imposed by this Act, are not invalidated or affected by this Act.

(b) Notwithstanding subsection (a) of this Section, the regulation, licensing, possession, and registration of handguns and ammunition for a handgun, and the transportation of any firearm and ammunition by a holder of a valid Firearm Owner's Identification Card issued by the Department of State Police under this Act are exclusive powers and functions of this State. Any ordinance or regulation, or portion of that ordinance or regulation, enacted on or before the effective date of this amendatory Act of the 98th General Assembly that purports to impose regulations or restrictions on a holder of a valid Firearm Owner's Identification Card issued by the Department of State Police under this Act in a manner that is inconsistent with this Act, on the effective date of this amendatory Act of the 98th General Assembly, shall be invalid in its application to a holder of a valid Firearm Owner's Identification Card issued by the Department of State Police under this Act.

(c) Notwithstanding subsection (a) of this Section, the regulation of the possession or ownership of assault weapons are exclusive powers and functions of this State. Any ordinance or regulation, or portion of that ordinance or regulation, that purports to regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act, shall be invalid unless the ordinance or regulation is enacted on, before, or within 10 days after the effective date of this amendatory Act of the 98th General Assembly. Any ordinance or regulation described in this subsection (c) enacted more than 10 days after the effective date of this amendatory Act of the 98th General Assembly is invalid. An ordinance enacted on, before, or within 10 days after the effective date of this amendatory

Act of the 98th General Assembly may be amended. The enactment or amendment of ordinances under this subsection (c) are subject to the submission requirements of Section 13.3. For the purposes of this subsection, 'assault weapons' means firearms designated by either make or model or by a test or list of cosmetic features that cumulatively would place the firearm into a definition of 'assault weapon' under the ordinance.

(d) For the purposes of this Section, 'handgun' has the meaning ascribed to it in Section 5 of the Firearm Concealed Carry Act.

(e) This Section is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution." 430 ILCS 65/13.1 (West 2018).

¶ 35 This appeal presents four questions with respect to Deerfield's bans of assault weapons and large capacity magazines: (1) does section 13.1 of the FOID Card Act preempt all regulation of assault weapons by home rule units; (2) if not, was Deerfield's 2013 ordinance "inconsistent with" the FOID Card Act, within the meaning of section 13.1(c) of that Act; (3) if Deerfield's 2013 ordinance was inconsistent with the FOID Card Act, were Deerfield's 2018 ordinances mere amendments to the 2013 ordinance, as allowed by section 13.1(c); and (4) to the extent that Deerfield's ban of large capacity magazines regulates ammunition for handguns, is such a ban preempted by section 13.1(b) of the FOID Card Act and section 90 of the Concealed Carry Act?

¶ 36 3. *Section 13.1 of the FOID Card Act Does Not Preempt All*

*Regulation of Assault Weapons by Home Rule Units*

¶ 37 The trial court determined that section 13.1 of the FOID Card Act preempts all regulation by home rule units relating to the possession or ownership of assault weapons. Easterday and Guns Save Life defend the court's conclusion on this point. In doing so, they focus heavily on the

language of section 13.1(e) ("This Section is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution." (430 ILCS 65/13.1(e) (West 2018)), along with the first sentence of section 13.1(c) ("[T]he regulation of the possession or ownership of assault weapons are exclusive powers and functions of this State." (430 ILCS 65/13.1(c) (West 2018)).

¶ 38   Deerfield, on the other hand, argues that the interpretation espoused by Easterday, Guns Save Life, and the trial court fails to give effect to the following language in section 13.1(c):

> "Any ordinance or regulation, or portion of that ordinance or regulation, that purports to regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act, shall be invalid *unless the ordinance or regulation is enacted on, before, or within 10 days after the effective date of this amendatory Act of the 98th General Assembly*. Any ordinance or regulation described in this subsection (c) enacted more than 10 days after the effective date of this amendatory Act of the 98th General Assembly is invalid." (Emphasis added.) 430 ILCS 65/13.1(c) (West 2018).

Taking this language into account, Deerfield maintains that the legislature adopted a "unique, hybrid form of concurrent jurisdiction over assault weapons." According to Deerfield, home rule units that regulated assault weapons within the window specified in section 13.1(c) retain their concurrent regulatory power; home rule units that failed to regulate assault weapons within this window, on the other hand, are prohibited from regulating on this subject.

¶ 39   Deerfield's interpretation of the statute prevails. As noted above, if it is possible to do so, we should embrace an interpretation that gives a reasonable meaning to each word, clause, and sentence of the statute without rendering any language superfluous. *Murphy-Hylton*, 2016 IL

120394, ¶ 25. Contrary to what the trial court concluded, we believe that it is possible to give effect to all of the language of section 13.1.

¶ 40    To be sure, section 13.1(e) and the first sentence of section 13.1(c) contain language that, if isolated from the rest of the statute, would generally be interpreted as preempting all local regulation of assault weapons. See *City of Chicago v. Roman*, 184 Ill. 2d 504, 517-18 (1998) (collecting examples of statutes where the legislature evinced its intent to preempt all regulation by home rule units on various topics). Nevertheless, we must consider the statute as a whole, construing words and phrases in their proper context rather than in isolation. *Iwan Ries*, 2019 IL 124469, ¶ 19. Immediately after declaring that "the regulation of the possession or ownership of assault weapons are exclusive powers and functions of this State," the statute carves out an exception for ordinances and regulations that were enacted on, before, or within 10 days of the statute's effective date. 430 ILCS 65/13.1(c) (West 2018). The statute adds that such ordinances may be amended outside the 10-day window. 430 ILCS 65/13.1(c) (West 2018).

¶ 41    Construing these provisions together, it is apparent that the legislature did not intend to preempt all regulation of assault weapons by home rule units. Instead, as Deerfield suggests, the legislature contemplated a hybrid balance of regulatory power between the State and local governments, whereby certain home rule units would have the authority to concurrently regulate assault weapons and others would not. In other words, the legislature intended that home rule units would be precluded from regulating assault weapons unless they took steps, within the prescribed timeframe, to regulate the possession or ownership of assault weapons in a manner that is inconsistent with the FOID Card Act.

¶ 42    For these reasons, we hold that the trial court erred in determining that section 13.1 of the FOID Card Act preempts all regulation of assault weapons by home rule units.

¶ 43        4. *Deerfield's 2013 Ordinance Was "Inconsistent With" the FOID Card Act*

¶ 44    The next issue is whether Deerfield retained its authority to regulate assault weapons concurrently with the State. There is no dispute that Deerfield enacted its 2013 ordinance within the window specified in section 13.1(c) of the FOID Card Act. The parties disagree, however, as to whether Deerfield's 2013 ordinance was "inconsistent with" the FOID Card Act. See 430 ILCS 65/13.1(c) (West 2018) ("[a]ny ordinance *** that purports to regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act[ ] shall be invalid" unless it is enacted within the specified window).

¶ 45    In the alternative to its conclusion that section 13.1 of the FOID Card Act categorically preempts local regulation of assault weapons, the trial court determined that, because Deerfield's 2013 ordinance merely regulated the transportation and storage of assault weapons, it was not inconsistent with the FOID Card Act. In the court's view, section 13.1(c) of the FOID Card Act "provided home rule units a one-time 10-day window from the date of this section's effective date to ban ownership or possession of assault weapons." The court reasoned that, because Deerfield failed to enact such a ban within this window, it "lost its opportunity to do so and cannot later amend its ordinance to impose such a ban."

¶ 46    On appeal, both Easterday and Guns Save Life defend the trial court's interpretation. Deerfield addresses this issue in a single footnote of its appellant's brief. Guns Save Life asks us to ignore Deerfield's argument because substantive material should not appear in footnotes. See *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 218 (2001) (striking footnotes from a brief that used footnotes (1) excessively, (2) to convey substantive arguments, and (3) to circumvent page limits). Although Deerfield should not have included substantive material in a footnote, we decline to strike the subject footnote or otherwise ignore Deerfield's argument. Deerfield did not

use footnotes excessively in its brief, nor did it use footnotes to circumvent page limits. Additionally, this appeal might have legal implications for other home rule units that enacted regulations within the 10-day window short of assault-weapon bans, which is another reason not to ignore Deerfield's argument.

¶ 47    Deerfield argues as follows:

"The term 'inconsistent with' refers to actions by a home-rule unit inconsistent with the State's exclusive jurisdiction absent action by a home-rule unit. The [FOID Card Act] merely asserted that the State now had exclusive jurisdiction. It did not impose any regulation beyond that. There was, despite the Circuit Court's assertion, no legislative or regulatory scheme with which to conflict. The only 'inconsistency' to which the provision refers would be the assertion of home-rule authority itself."

For the following reasons, we conclude that, although Deerfield comes closer to the proper interpretation, neither the parties nor the trial court accurately identified what the legislature intended when it allowed for local regulations of assault weapons that are "inconsistent with" the FOID Card Act.

¶ 48    The primary concern of the FOID Card Act is to regulate who may acquire or possess firearms, not which firearms those individuals may acquire or possess. See 430 ILCS 65/1 (West 2018). The Act defines "firearm" broadly, without excluding assault weapons. See 430 ILCS 65/1.1 (West 2018). Indeed, the only mention of assault weapons in the Act is in section 13.1(c). The Act's general rule, which is subject to numerous exceptions, is that no person who lacks a FOID card may acquire or possess within the State any firearm ammunition or any firearm, stun gun, or taser. 430 ILCS 65/2(a) (West 2018). Therefore, contrary to what Deerfield suggests, the

FOID Card Act does regulate assault weapons, insofar as it requires anyone who acquires or possesses such firearms to have a FOID card.

¶ 49    To ascertain what the legislature intended in section 13.1(c) of the FOID Card Act when it created a window for home rule units to "regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act," we must read section 13.1(c) within the context of the entire section. Section 13.1(a) sets forth the general rule that the Act is not intended to invalidate local regulations that require registration or impose "greater restrictions or limitations on the acquisition, possession and transfer of firearms than are imposed by this Act." 430 ILCS 65/13.1(a) (West 2018). Section 13.1(c) is designated as an exception to the rule outlined in section 13.1(a). The first sentence of section 13.1(c) provides: "Notwithstanding subsection (a) of this Section, the regulation of the possession or ownership of assault weapons are exclusive matters and functions of this State." 430 ILCS 65/13.1(c) (West 2018). The next sentence of section 13.1(c) creates an exception to the first sentence:

> "Any ordinance or regulation, or portion of that ordinance or regulation, that purports to regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act, shall be invalid unless the ordinance or regulation is enacted on, before, or within 10 days after the effective date of this amendatory Act of the 98th General Assembly." 430 ILCS 65/13.1(c) (West 2018).

Accordingly, when the legislature used the phrase "inconsistent with this Act" in section 13.1(c), it was in the context of providing an exception to an exception to the general rule that ordinances are not invalid merely because they require registration or impose greater restrictions on the acquisition, possession, or transfer of firearms than those which are imposed by the Act. Thus, a home rule unit's regulation is "inconsistent with" the Act where such regulation imposes greater

restrictions on assault weapons than the Act imposes. Any regulation of assault weapons beyond the mere requirement to possess a FOID card is inconsistent with the Act.

¶ 50     With this understanding, we hold that Deerfield's 2013 ordinance was inconsistent with the FOID Card Act because it regulated the possession and ownership of assault weapons beyond what was required by the Act. Specifically, the 2013 ordinance provided:

"It shall be unlawful to store or keep any assault weapon in the Village unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user. For purposes of this section, such weapon shall not be deemed stored or kept when being carried by or under the control of the owner or other lawfully authorized user." Deerfield Municipal Code § 15-87(a) (added July 1, 2013).[6]

Additionally, the 2013 ordinance stated:

"It is unlawful and a violation of this section for any person to carry or possess an assault weapon in the Village, except when on his land or in his own abode, legal dwelling or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, except that this section does not apply to or affect transportation of assault weapons that meet one of the following conditions:

(i) are broken down in a non-functioning state; or

---

[6] This rule was subject to a self-defense exception: "No person shall be punished for a violation of this section if an assault weapon is used in a lawful act of self-defense or in defense of another." Deerfield Municipal Code § 15-87(b) (added July 1, 2013).

(ii) are not immediately accessible; or

(iii) are unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person who has been issued a currently valid Firearm Owner's Identification Card." Deerfield Municipal Code § 15-88(a) (added July 1, 2013).[7]

Having regulated the possession and ownership of assault weapons in a manner that was inconsistent with the FOID Card Act, Deerfield preserved its power to regulate assault weapons concurrently with the State.

¶ 51    The dissent disagrees with the majority's conclusion that Deerfield regulated both possession and ownership of assault weapons in its 2013 ordinance. In the dissent's view, Deerfield timely regulated only the possession of assault weapons, so it lacked authority under section 13.1(c) of the FOID Card Act to amend its ordinance in 2018 to regulate the ownership of assault weapons. We note that neither the trial court nor the parties embraced this rationale. One need look only to the title of Deerfield's 2013 ordinance to understand why. That ordinance was entitled: "An Ordinance Regulating the Ownership and Possession of Assault Weapons in the Village of Deerfield." Aside from the title, the restrictions outlined in Deerfield's 2013 ordinance applied equally to persons who both possessed and owned assault weapons and to persons who possessed such weapons but did not own them. By the plain terms of the 2013 ordinance, whenever an assault weapon was not under the control of or being carried by the owner or some other lawfully authorized user, the weapon had to be secured by them in a locked container or equipped with a tamper-resistant mechanical lock or another safety device. In the majority's view, Deerfield

_____

[7] The requirements of sections 15-87 and 15-88 did not apply to law enforcement or military personnel. Deerfield Municipal Code §§ 15-87(c), 15-88(b) (added July 1, 2013).

plainly regulated both the possession and ownership of assault weapons within the 10-day window specified in section 13.1(c) of the FOID Card Act.

¶ 52    Furthermore, as a practical matter, it is not clear how courts could distinguish between regulations that affect only possession and regulations that affect both possession and ownership. Ownership and possession are interrelated concepts. For example, one definition of "owner" is "[s]omeone who has the right to possess, use, and convey something." Black's Law Dictionary (11th ed. 2019). One definition of "possession" is "[s]omething that a person owns or controls." Black's Law Dictionary (11th ed. 2019). In a similar vein, Deerfield defines "owner" in its municipal code as, in relevant portion, "one who has complete *dominion* over particular property and who is the one in whom legal or equitable title rests." (Emphasis added.) Deerfield Municipal Code § 1-2(a)(25) (added 1963). "Dominion," in turn, is defined as "[c]ontrol; possession." Black's Law Dictionary (11th ed. 2019). In light of these overlapping definitions, it is not clear how an assault weapon ordinance could regulate possession without also regulating ownership. When Deerfield told its residents in 2013 how they had to store and transport their assault weapons, such regulations affected residents' rights as owners of such weapons.

¶ 53    Even if the dissent were correct that "[p]ossession and ownership are completely distinct concepts" (*infra* ¶ 87), at the very least, in its 2013 ordinance, Deerfield timely regulated either the "possession or ownership of assault weapons in a manner that is inconsistent with" the FOID Card Act. 430 ILCS 65/13.1(c) (West 2018). For example, as explained above, Deerfield's 2013 rules relating to storing assault weapons went beyond the requirements of the FOID Card Act. Under the plain language of the statute, that was all that Deerfield needed to do to preserve its authority to regulate assault weapons concurrently with the State.

¶ 54                              5. *Deerfield Amended Its 2013 Ordinance*

¶ 55    The next question is whether Deerfield's 2018 ordinances were amendments to the 2013 ordinance, as allowed by section 13.1(c) of the FOID Card Act. We hold that they were.

¶ 56    Our analysis is straightforward. As explained above, by amending section 13.1 of the FOID Card Act in 2013, the legislature created a hybrid balance of regulatory power between the State and local governments, whereby certain home rule units would have the authority to concurrently regulate assault weapons and others would not. Deerfield preserved its power to regulate assault weapons concurrently with the State when it enacted its 2013 ordinance. The legislature explicitly declared that home rule units that preserved their power to regulate assault weapons concurrently with the State could amend their ordinances. See 430 ILCS 65/13.1(c) (West 2018) ("An ordinance enacted on, before, or within 10 days after the effective date of this amendatory Act of the 98th General Assembly may be amended."). In 2018, Deerfield twice purported to amend its 2013 ordinance and imposed a complete civilian ban on assault weapons and large capacity magazines. Because Deerfield had the power to regulate assault weapons concurrently with the State, it was Deerfield's prerogative to ban such weapons, and there were no time limitations for doing so.

¶ 57    Relying on *Athey v. City of Peru*, 22 Ill. App. 3d 363 (1974), the trial court nevertheless conducted a "comparative analysis" of the 2013 and 2018 ordinances to evaluate the extent of the changes. Noting the "significant differences" between the 2013 ordinance and the 2018 ordinances, the court accepted Easterday's and Guns Save Life's arguments that the 2018 ordinances were new ordinances rather than mere amendments to the 2013 ordinance.

¶ 58    In *Athey*, the plaintiff property owners filed an action challenging the City of Peru's ordinance No. 1699, which rezoned an adjacent property from residential to commercial. *Athey*, 22 Ill. App. 3d at 365-66. One disputed issue in the action was whether ordinance No. 1699 was a new ordinance or whether it was an amendment of ordinance No. 1497. *Athey*, 22 Ill. App. 3d at

366. That issue was significant to the litigation because amendments to existing ordinances required a two-thirds vote of the city council to pass, whereas new ordinances could be enacted by a majority vote. *Athey*, 22 Ill. App. 3d at 366. The appellate court recognized that it was called upon to ascertain the city council's intent. See *Athey*, 22 Ill. App. 3d at 367 ("The primary purpose of construction of ordinances is to determine and give full effect to the intent of the law-making body as revealed by the language used."). Ascertaining that intent was complicated, however, by the fact that ordinance No. 1699's introductory clause was ambiguous: " 'Whereas the City of Peru, Illinois now desires to amend comprehensively its existing ordinance by adopting a new ordinance.' " *Athey*, 22 Ill. App. 3d at 367. Additionally, during the legislative process, the city council interchangeably referred to ordinance No. 1699 as a "comprehensive amendment" and a "new ordinance." *Athey*, 22 Ill. App. 3d at 367. Under those circumstances, the court undertook a "comparative analysis" of the two ordinances. *Athey*, 22 Ill. App. 3d at 368. Upon doing so, the court determined that ordinance No. 1699 was a new ordinance rather than an amendment of ordinance No. 1497. *Athey*, 22 Ill. App. 3d at 368.

¶ 59    Unlike in *Athey*, there is no need to undertake a comparative analysis of Deerfield's ordinances. Deerfield indicated that it intended for the 2018 ordinances to serve as amendments to the 2013 ordinance. For example, the titles of the 2018 ordinances reflected that intent, as did the ordinances' introductory paragraphs. All changes were reflected by striking through language that was to be removed from the municipal code and underlining language to be added. There was no ambiguity as to Deerfield's intent, so we need not resort to additional cannons of interpretation to ascertain that intent.

¶ 60    The other cases that the trial court cited—*Village of Park Forest v. Wojciechowski*, 29 Ill. 2d 435 (1963), and *Nolan v. City of Granite City*, 162 Ill. App. 3d 187 (1987)—are distinguishable.

The issue in both of those cases was whether ordinances remained in effect after the respective municipal bodies enacted other ordinances touching on the same subjects. In the present case, by contrast, there is no ambiguity or dispute as to which portions of the 2013 ordinance remained in effect after the enactment of the 2018 ordinances.

¶ 61 Even so, both *Wojciechowski* and *Nolan* recognized that the paramount consideration is whether the municipal body intended to amend versus repeal the earlier ordinance. See *Wojciechowski*, 29 Ill. 2d at 439 ("[T]here was no manifestation of an intent to entirely revise and repeal the original ordinance."); *Nolan*, 162 Ill. App. 3d at 190 ("We find no intention to repeal ordinance No. 2574 in ordinance 2910 or any evidence of inconsistency between the two."). Deerfield intended for its 2018 ordinances to serve as amendments to the 2013 ordinance, not to repeal the 2013 ordinance. The trial court essentially concluded that, notwithstanding this clearly expressed intent, the changes that Deerfield made were more drastic than the legislature contemplated when it enacted section 13.1(c) of the FOID Card Act. We find no support for the trial court's decision on this point in the case law or the text of section 13.1(c).

¶ 62 Both Easterday and Guns Save Life note that section 1-7 of the Deerfield Municipal Code provides:

> "The provisions appearing in this Code, insofar as they relate to the same subject matter and are substantially the same as those ordinance provisions previously adopted by the Village and existing at the effective date of this Code, shall be considered as restatements and continuations thereof and not as new enactments." Deerfield Municipal Code § 1-7 (added 1963).

According to Easterday and Guns Save Life, Deerfield's 2018 ordinances were not substantially the same as the 2013 ordinance, so they must be new enactments rather than amendments. We

reject this reasoning. The provision that Easterday and Guns Save Life cite merely indicates that, when Deerfield enacted its municipal code, Deerfield generally intended to restate its ordinances that were already in existence. Contrary to what Easterday and Guns Save Life argue, section 1-7 does not invite courts to second guess Deerfield's intent where, as here, it specifically declared that it intended to amend an ordinance.

¶ 63    We already outlined the majority's view that the dissent's analysis proceeds from the faulty premise that Deerfield regulated the possession but not ownership of assault weapons in its 2013 ordinance. See *supra* ¶¶ 51-53. Even if this premise were correct, however, we would find no support for the conclusion that a home rule unit that timely regulated the possession of assault weapons could not amend its statute outside the 10-day window to regulate ownership. The text of section 13.1(c) of the FOID Card Act certainly does not say that. As noted above, the statute merely says that an ordinance enacted within the 10-day window "may be amended." 430 ILCS 65/13.1(c) (West 2018). When interpreting a statute, a court "must not depart from the plain meaning of the statutory language by reading into it exceptions, limitations, or conditions not expressed by the legislature." *In re Estate of Shelton*, 2017 IL 121199, ¶ 36. We thus should not read an exception into section 13.1(c) by interpreting it to mean that a home rule unit may amend its ordinance so long as it does not switch from regulating possession to regulating ownership.

¶ 64    Moreover, we found nothing supporting the dissent's view in the lengthy floor debates of Public Act 98-63 (eff. July 9, 2013) (the 2013 legislation that enacted the Concealed Carry Act and amended section 13.1 of the FOID Card Act). At no point did any lawmaker mention or insinuate that the legislature intended to distinguish between possessing assault weapons and owning such weapons. Nor did any lawmaker mention or insinuate that home rule units had to ban assault weapons within the 10-day window or forever lose their power to do so.

¶ 65    To the contrary, the legislative history suggests that the legislature intended that home rule units could preserve their authority to regulate assault weapons concurrently with the State simply by enacting a regulation within the 10-day window. The following excerpt from the exchange between Senators Raoul and Forby (Senator Forby was one of the bill's sponsors) illustrates this point:

> "SENATOR RAOUL: Can a—can a municipality or home rule unit that has enacted a regulation or ordinance either before or within ten days of the effective date that regulates assault weapons amend that regulation or ordinance in the future?
>
> PRESIDING OFFICER (SENATOR MUÑOS): Senator Forby.
>
> SENATOR FORBY: Yes." 98th Ill. Gen. Assem., Senate Proceedings, May 31, 2013, at 21 (statements of Senators Raoul, Muños, and Forby).

Thus, even assuming that the dissent is correct that Deerfield initially regulated only the possession of assault weapons and then subsequently regulated ownership, that is consistent with the legislature's intent.

¶ 66         6. *Impact of Section 13.1(b) of the FOID Card Act and Section 90 of the*
             *Concealed Carry Act on Deerfield's Ban of Large Capacity Magazines*

¶ 67    The parties also disagree as to the impact of section 13.1(b) of the FOID Card Act and section 90 of the Concealed Carry Act on Deerfield's ban of large capacity magazines. The trial court determined that, in light of these statutes, "home rule units no longer have the authority to regulate or restrict the licensing and possession of *** handgun ammunition with respect to a holder of a valid Firearm Owner's Identification Card or a holder of a license to carry a concealed firearm." On appeal, Deerfield maintains that large capacity magazines are commonly understood as components of assault weapons. Deerfield would have us believe that large capacity magazines

are also exclusively components of assault weapons. To that end, Deerfield emphasizes that assault-weapon bans across the country traditionally have included bans of large capacity magazines. Easterday and Guns Save Life assert that Deerfield forfeited its arguments on these points and that, forfeiture aside, Deerfield's arguments lack merit. Essentially, Easterday and Guns Save Life contend that large capacity magazines are not exclusive to assault weapons and can be used with handguns.

¶ 68    In its reply brief, Deerfield points to a four-page colloquy between its counsel and the trial court, which Deerfield maintains was sufficient to preserve this issue for appeal. During that colloquy, Deerfield's counsel mentioned some, but not all, of the points that Deerfield now raises in support of its argument on appeal. Under the circumstances, we choose to overlook any forfeiture and address the merits, as doing so is necessary to obtain a just result and to maintain a sound and uniform body of precedent. See *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 22.

¶ 69    Section 13.1(b) of the FOID Card Act unambiguously prohibits home rule units from regulating handgun ammunition in a manner that is inconsistent with the FOID Card Act:

"Notwithstanding subsection (a) of this Section, the regulation, licensing, possession, and registration of handguns and ammunition for a handgun *** are exclusive powers and functions of this State. Any ordinance or regulation, or portion of that ordinance or regulation, enacted on or before the effective date of this amendatory Act of the 98th General Assembly that purports to impose regulations or restrictions on a holder of a valid Firearm Owner's Identification Card issued by the Department of State Police under this Act in a manner that is inconsistent with this Act, on the effective date of this amendatory Act of the 98th General Assembly, shall be invalid in its application to a holder of a valid

Firearm Owner's Identification Card issued by the Department of State Police under this Act." 430 ILCS 65/13.1(b) (West 2018).

Section 90 of the Concealed Carry Act similarly prohibits home rule units from regulating handgun ammunition in a manner that is inconsistent with the Concealed Cary Act:

"The regulation, licensing, possession, registration, and transportation of handguns and ammunition for handguns by licensees are exclusive powers and functions of the State. Any ordinance or regulation, or portion thereof, enacted on or before the effective date of this Act that purports to impose regulations or restrictions on licensees or handguns and ammunition for handguns in a manner inconsistent with this Act shall be invalid in its application to licensees under this Act on the effective date of this Act. This Section is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution." 430 ILCS 66/90 (West 2018).

¶ 70 The question presented is whether Deerfield's ban of large capacity magazines improperly regulates handgun ammunition. Deerfield defines "large capacity magazine" as

"any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

(1) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

(2) A 22 caliber tube ammunition feeding device.

(3) A tubular magazine that is contained in a lever-action firearm."

Deerfield Municipal Code § 15-86 (added July 1, 2013).

Guns Save Life asserts that many popular handguns that do not qualify as "assault weapons" under Deerfield's definition of that term come standard with magazines that hold more than 10 rounds.

Deerfield does not dispute that assertion. Moreover, when the trial court questioned Deerfield's counsel about whether Deerfield's definition of "large capacity magazine" was overbroad to the extent that it applied to handgun ammunition, counsel acknowledged that Deerfield bans "any magazine ten rounds or more."

¶ 71    Deerfield nevertheless insists that large capacity magazines are exclusively components of assault weapons. The plain language of Deerfield's definition of "large capacity magazine," however, does not exclude handgun ammunition. Deerfield also claims that its definitions of "assault weapon" and "large capacity magazine" are similar or identical to those that have been enacted across the country and which have withstood challenges on second amendment grounds. See, *e.g.*, *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). Be that as it may, the plaintiffs here challenge Deerfield's ban of large capacity magazines on preemption grounds, not second amendment grounds, and the Illinois legislature has indicated that home rule units may not regulate ammunition for handguns in a manner that is inconsistent with State law. It is the judiciary's role to enforce statutes as written, not to question the wisdom of the legislature. See *Manago v. County of Cook*, 2017 IL 121078, ¶ 10 ("Whenever possible, courts must enforce clear and unambiguous statutory language as written, without reading in unstated exceptions, conditions, or limitations."). As our supreme court explained in *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 50: "[T]he wisdom of this state's regulatory system is a matter for the legislature, not our court. Of all the principles of statutory construction, few are more basic than that a court may not rewrite a statute to make it consistent with the court's own idea of orderliness and public policy." We thus hold that, to the extent that Deerfield's ban of large capacity magazines regulates ammunition for handguns, it is preempted in its application to holders of valid FOID cards and

concealed carry licenses by section 13.1(b) of the FOID Card Act and section 90 of the Concealed Carry Act. Accordingly, on this limited point, we affirm the trial court's grant of summary judgment in favor of Easterday and Guns Save Life.

¶ 72                    7. *Proposed Alternative Basis to Affirm*

¶ 73    Guns Save Life argues that, as an alternative basis to affirm the trial court's judgment, we should conclude that the Wildlife Code preempts Deerfield's bans of assault weapons and large capacity magazines. We lack jurisdiction to consider this issue because Guns Save Life's claims regarding the Wildlife Code remain pending in the trial court.

¶ 74    In counts II and IV of its amended complaint, Guns Save Life alleged that Deerfield's 2018 ordinances were preempted by the Wildlife Code insofar as they banned assault weapons and large capacity magazines. Guns Save Life moved for summary judgment on all of its claims. Deerfield opposed Guns Save Life's motion for summary judgment but did not file a cross-motion for summary judgment.

¶ 75    On March 22, 2019, the trial court determined that the Wildlife Code *did not* preempt Deerfield's 2018 ordinances. The effect of that ruling was to deny summary judgment with respect to counts II and IV of Guns Save Life's amended complaint. On September 6, 2019, the court made Rule 304(a) findings with respect to counts I through IV of Guns Save Life's amended complaint.

¶ 76    "The denial of a summary judgment motion is not a final order and is normally not appealable even where the court has made a finding pursuant to Illinois Supreme Court Rule 304(a)." *Fogt v. 1-800-Pack-Rat, LLC*, 2017 IL App (1st) 150383, ¶ 95. The exception to this rule is where the parties file cross-motions for summary judgment and the trial court disposes of all issues in the case by granting one motion and denying the other. *Fogt*, 2017 IL App (1st) 150383,

¶ 95. The parties here did not file cross-motions for summary judgment and the trial court did not dispose of all issues in the case, so the exception does not apply. We lack jurisdiction to review the court's denial of summary judgment with respect to counts II and IV of Guns Save Life's amended complaint.

¶ 77                                    8. *Summary of Holdings*

¶ 78    In summary, we hold that (1) section 13.1 of the FOID Card Act does not preempt all regulation of assault weapons by home rule units; (2) Deerfield, in its 2013 ordinance, regulated the possession and ownership of assault weapons in a manner that was inconsistent with the FOID Card Act, thus preserving its power to regulate assault weapons concurrently with the State; (3) Deerfield's 2018 ordinances were amendments to the 2013 ordinance, as allowed by section 13.1(c) of the FOID Card Act; (4) to the extent that Deerfield's ban of large capacity magazines regulates ammunition for handguns, it is preempted in its application to holders of valid FOID cards and concealed carry licenses by section 13.1(b) of the FOID Card Act and section 90 of the Concealed Carry Act; and (5) we lack jurisdiction to consider Guns Save Life's claims that Deerfield's bans of assault weapons and large capacity magazines are preempted by the Wildlife Code. Accordingly, we affirm in part and reverse in part the trial court's orders granting summary judgment in favor of Easterday and Guns Save Life. We affirm the orders granting the permanent injunctions only insofar as that, to the extent that Deerfield's ban of large capacity magazines regulates ammunition for handguns, Deerfield is prohibited from enforcing that regulation against persons who hold valid FOID cards or concealed carry licenses. In all other respects, the permanent injunctions are vacated. We remand the cause for further proceedings consistent with this opinion.

¶ 79                                    III. CONCLUSION

¶ 80     For the foregoing reasons, we affirm the judgments of the circuit court of Lake County in part and reverse the judgments in part. We vacate the permanent injunctions in part and remand the cause for further proceedings consistent with this opinion.

¶ 81     Affirmed in part and reversed in part. Permanent injunctions vacated in part. Cause remanded.

¶ 82     JUSTICE McLAREN, concurring in part and dissenting in part.

¶ 83     I dissent from the majority's conclusion that Deerfield, in its 2013 ordinance, regulated ownership of assault weapons, and that Deerfield's 2018 ordinance[8] prohibiting the ownership of assault weapons was an amendment allowed by the legislature.

¶ 84     In section 13.1(c) of the FOID Card Act, the legislature allowed home rule municipalities to "regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act." 430 ILCS 65/13.1(c) (West 2018). Such opportunity had to be exercised on, before, or within 10 days after the effective date of the amendatory Act. *Id.* Deerfield acted within this time frame, enacting the 2013 ordinance that provided:

> "It shall be unlawful to store or keep any assault weapon in the Village unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user. For purposes of this section, such weapon shall not be deemed stored or kept when being carried by or under the control of

---

[8] While Deerfield passed two 2018 ordinances relevant to the case, I will refer to them as a singular ordinance.

the owner or other lawfully authorized user." Deerfield Municipal Code § 15-87(a) (added July 1, 2013).

The ordinance also limited where in the Village a person could "carry or possess" an assault weapon and provided for various methods of transportation of assault weapons in otherwise-prohibited areas. See Deerfield Municipal Code § 15-88(a) (added July 1, 2013).

¶ 85    The majority makes the bald assertion that Deerfield's 2013 ordinance "regulated the possession *and ownership* of assault weapons beyond what was required by the [FOID] Act." (Emphasis added). *Supra* ¶ 50. "Regulate" is defined as "to govern or direct according to rule"; "to bring under the control of law or constituted authority"; "to make regulations for or concerning." Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/regulate (last visited Nov. 4, 2020) [https://perma.cc/KJA4-CPQC].

¶ 86    The 2013 ordinance regulated the *possession* of assault weapons, imposing restrictions on *how* assault weapons may be stored, kept, and transported. However, that ordinance in no way regulated the *ownership* of assault weapons. The 2013 ordinance allowed one to store or keep an assault weapon in the Village so long as it was secured in such a way as to make it inoperable by anyone other than the owner or an authorized user. Further, it provided that an assault weapon "shall not be deemed stored or kept when being carried by or under the control of the owner or other lawfully authorized user." Deerfield Municipal Code, § 15-87(a) (added July 1, 2013). The ordinance also limited where in the Village assault weapons could be carried or possessed and how they could be transported, but ownership of assault weapons was never addressed, let alone "in a manner that is inconsistent with this [FOID] Act." See 430 ILCS 65/13.1(c) (West 2018).

¶ 87    However, the majority never explains how the ordinance regulated *ownership* of assault weapons. Possession and ownership are completely distinct concepts, and we must give meaning

to the legislature's use of these concepts separately. The majority's claim that possession and ownership are indistinguishable (see *supra* ¶ 52) is both weak[9] and irrelevant. To "regulate" ownership involves limiting who may own some item, even to the point of prohibiting ownership of the item. The 2013 ordinance did not prevent anyone eligible to own an assault weapon under state law from owning one. The 2013 ordinance did not regulate ownership; it *assumed* ownership of such weapons within the village. It specifically contemplated the carrying, control, and operation of assault weapons by owners and other authorized users. None of the requirements regarding securing an assault weapon or using a lock or other security device apply when the owner or any other authorized user is carrying or controlling the weapon. The ordinance did not impose any greater restrictions on *ownership* of assault weapons than the FOID Act imposed. It merely regulated where a person could carry or possess assault weapons, how the owner must store such weapons when they are not being carried, and how they may be transported.

¶ 88     The FOID Act allowed home-rule municipalities to "regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act." 430 ILCS 65/13.1(c) (West 2018). It also allowed for the future amendment of an ordinance enacted on, before, or within 10 days after the effective date of the Act. Because Deerfield did not act to regulate ownership of assault weapons within the allotted 10-day window with its 2013 ordinance, the majority's conclusion that the 2018 ordinance prohibiting ownership is an amendment allowed under the FOID Act is an enthymeme. A legislative enactment that explicitly recognizes the right to own an assault weapon is not "amended" by a later enactment that prohibits such ownership; it is superseded by it. The Law Dictionary (featuring Black's Law Dictionary Free Online Legal

---

[9] For example, you cannot legally sell your friend's car when he merely loans it to you.

Dictionary (2d Ed.)) defines "amend" as "To improve; to make better by change or modification." The Law Dictionary, https://thelawdictionary.org/amend/ (last visited Nov. 4, 2020) https://perma. cc/QT9T-AXMC. It defines "supersede" as "To annul; to stay; to suspend." The Law Dictionary, https://thelawdictionary.org/supersede/ (last visited Nov. 4, 2020) [https://perma.cc/4M4T-L879]. Having regulated the storage and transportation of assault weapons in 2013, Deerfield could have changed or modified those restrictions, either increasing or decreasing the severity of the restrictions in the 2018 ordinance. However, Deerfield did not regulate ownership, and one cannot amend a regulation that does not exist. Deerfield's 2018 ordinance did not merely "improve" or "make better" the 2013 ordinance; it annulled the 2013 ordinance, wiping out the right to ownership of assault weapons that Deerfield had explicitly recognized in 2013. It was a complete reversal of its 2013 ordinance, now prohibiting that which had previously clearly been allowed.

¶ 89     Looking to the titles and introductory paragraphs of the 2018 ordinances, the majority posits that the 2018 ordinance was an amendment of the 2013 ordinance because:

> "Deerfield indicated that it intended for the 2018 ordinances to serve as amendments to the 2013 ordinance. For example, the titles of the 2018 ordinances reflected that intent, as did the ordinances' introductory paragraphs. All changes were reflected by striking through language that was to be removed from the municipal code and underlining language to be added. There was no ambiguity as to Deerfield's intent, so we need not resort to additional cannons of interpretation to ascertain that intent." *Supra* ¶ 59.

There is a riddle attributed to Abraham Lincoln: how many legs does a dog have if you call his tail a leg? The answer, of course, is four; calling a tail a leg does not make it a leg. See BrainyQuote, https://www.brainyquote.com/quotes/abraham_lincoln_107482 (last visited Nov. 4, 2020) [https://perma.cc/6DYW-XXKF]. Similarly, here, the simple act of calling the 2018 ordinance an

amendment of the 2013 ordinance does not make it one. "We view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *People v. Gutman*, 2011 IL 110338, ¶ 12. Further, we assume that, whenever a legislative body enacts a provision, it has in mind previous statutes relating to the same subject matter such that they should all be construed together. See *People v. Davis*, 199 Ill. 2d 130, 137 (2002). The majority states that it believes that Deerfield "indicated" what it "intended" to do with the 2018 ordinance (*supra* ¶ 59); however, viewing the 2018 ordinance in the context of the 2013 ordinance, what Deerfield *did* in 2018 was to regulate the ownership of assault weapons, an issue that it did not regulate when it had the opportunity to do so in 2013.

¶ 90    I also find unpersuasive the majority's assertion that the 2018 ordinance was an amendment because "changes were reflected by striking through language that was to be removed from the municipal code and underlining language to be added." *Supra* ¶ 59. Had Deerfield struck any references to assault rifles and added underlined references to dogs, would that be an indication that the new ordinance was an amendment of Deerfield's animal control ordinance? Again, Deerfield did not regulate ownership in 2013; its addition of ownership in the 2018 ordinance indicates an attempt to write new legislation, not to amend an ordinance that did not regulate ownership.

¶ 91    The majority's use of the legislative history for support (*supra* ¶¶ 64-65) is puzzling. First, we already knew that amendments of ordinances passed within the 10-day window were allowed. See 430 ILCS 65/13.1 (West 2018). Second, the argument based on the quoted passage is a textbook exercise in tautology. In essence, the majority says, "Because Senator Forby said that municipalities can amend, this is an amendment." I have argued that the 2018 ordinance was not an amendment of the 2013 ordinance but a supersedure of that ordinance. Nothing in the cited

legislative debate addresses, let alone refutes, my argument or can be used to support a claim that a municipality can use a new ordinance to nullify or supersede a previous ordinance.[10]

¶ 92    Perhaps an analogy to a more mundane issue of governance will more clearly demonstrate the majority's analysis is faulty. Assume that, in 2013, Deerfield passed an ordinance requiring that the owners of pickup trucks park their trucks in a driveway or garage when they are not using the trucks. Then, in 2018, Deerfield passed a new ordinance prohibiting the ownership of pickup trucks in the Village. Would the majority consider the parking restrictions on pickup trucks to be a regulation of ownership? Would it consider the 2018 prohibition of ownership a mere "amendment" of the 2013 parking ordinance? Both the actual and the fictional 2013 ordinances assumed ownership of the items at issue and merely regulated how they must be stored and secured. The 2018 ordinances outlawed their possession. Would the majority really consider the outlawing of pickup trucks to be an amendment of parking regulations?

¶ 93    "[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 780 (2010). This right also extends to self-defense outside the home. See *People v. Aguilar*, 2013 IL 112116, ¶ 21. Deerfield's 2013 ordinance appears to have paid heed to this. It did not affect the right to own assault weapons; it merely addressed how such weapons had to be stored in the home when they were not being carried or under the control of the owner or another authorized user. However, the 2018 ordinance strikes at the very heart of the right to bear arms for

---

[10] The majority's whimsical exploration of the "lengthy floor debates" (*supra* ¶ 64) produces a single exchange—one question with a monosyllabic answer—that Baron von Munchausen could employ for support.

self-defense. Where a government's actions restrict or regulate the exercise of second amendment rights, Illinois courts apply heightened means-ends scrutiny to the government's justification for its regulations. See *People v. Chairez*, 2018 Il 121417, ¶ 21. While these cases were not brought on constitutional grounds, they do involve restrictions that affect second amendment rights. The flaccid foundation for the majority's conclusion ("Well, that is what the Village said that it wanted to do.") certainly falls well short of the scrutiny that should be applied in this case.

¶ 94     Ultimately, the legislature gave home-rule municipalities the opportunity to regulate ownership of assault weapons, possession of assault weapons, or both. Such regulation had to occur within a specific 10-day period. Deerfield regulated possession *only* of assault weapons within that period. It did not restrict, let alone prohibit, ownership of assault weapons in Deerfield. The majority's conclusion that "it was Deerfield's prerogative to ban such weapons, and there were no time limitations for doing so" (*supra* ¶ 56) is factually and legally wrong. Deerfield's attempt to ban ownership of assault weapons in 2018 was late and outside the intent of the legislature. The trial court should be affirmed.

---

**No. 2-19-0879**

---

| | |
|---|---|
| **Cite as:** | *Easterday v. Village of Deerfield*, 2020 IL App (2d) 190879 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 18-CH-427, 18-CH-498; the Hon. Luis A. Berrones, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Christopher B. Wilson, John B. Sample, and Christopher P. Eby, of Perkins Coie LLP, and Steven M. Elrod and Hart M. Passman, of Elrod Friedman LLP, both of Chicago, and Jonathan E. Lowy, of Washington, D.C., for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | David G. Sigale, of Law Firm of David G. Sigale, P.C., of Wheaton, for appellees Daniel D. Easterday, Illinois State Rifle Ass'n, and Second Amendment Foundation, Inc. |
| | Christian D. Ambler, of Stone & Johnson, Chtrd., of Chicago, and Brian W. Barnes, of Cooper & Kirk, PLLC, of Washington, D.C., for other appellees. |

---